UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

2004 APR 27  A 11: 15

U.S. DISTRICT COURT
HARTFORD, CT.

WENDELL "JD" HOUSTON,                    )
                                         )
                          Plaintiff,     )
                                         )
          v.                             )
                                         )
INFINITY RADIO LICENSE, INC.,            )    CIVIL ACTION
d/b/a WZMX/FM HOT 93.7, VIACOM, INC.,    )    NO. 303-CV-0130 (AWT)
INFINITY BROADCASTING CORPORATION,       )
INFINITY RADIO, INC., INFINITY MEDIA     )
CORPORATION and CBS RADIO, INC.,         )
                                         )
                          Defendants.    )
                                         )

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### I.    INTRODUCTION

Plaintiff Wendell Houston ("Houston") was employed for three years as morning show host on WZMX-FM, a radio station operated by the defendants (collectively "Infinity"), after which Infinity decided not to exercise an option to extend the contract for a third year. For much of his tenure at WZMX, Houston had been in daily conflict with his white female co-host, and he contends that his managers regularly took her side in reconciling those disagreements. Asked in deposition why he believed that his managers had been motivated by his race in dealing with those conflicts, Houston responded, "Because I'm black and she is white."

Those seven words sum up Houston's entire claim of race discrimination. He has no direct evidence of discrimination, and he has no evidence that decisionmakers were lying about their reasons for electing not to renew his contract, nor any relevant statistical or comparative evidence. There is no basis on which a

ORAL ARGUMENT REQUESTED

LITDOCS/546876.1

reasonable jury could find that Infinity discriminated against him on the basis of race or age. Defendants are entitled to summary judgment.

## II.    SUMMARY OF UNDISPUTED FACTS[1]

Infinity owns four leading radio stations in the Hartford area: WTIC-FM, WTIC-AM, WRCH, and WZMX. Deposition of Wendell Houston ("Houston Dep.") at 79. Steven Salhany is the Operations Manager for the four stations; he reports to the Senior Vice President, Suzanne McDonald. Deposition of Suzanne McDonald ("McDonald Dep.") at 3, 14. Both McDonald and Salhany work from Infinity's offices in Farmington, Connecticut, and all four stations broadcast from there.

### A.    Houston Is Hired, At A Salary 65% Higher Than He Has Ever Earned; Houston and Barrow Quarrel; Station Ratings Remain Poor.

Salhany, in consultation with McDonald, hired the plaintiff, J.D. Houston, in April 2000. McDonald Dep. at 48. The plaintiff is an African-American who was then five months from his 50th birthday. Declaration of Suzanne McDonald ("McDonald Decl.") ¶4. Houston was hired to host the morning show on WZMX, which was then playing music known in the industry as "dancin' oldies." Houston Dep. at 62. He was employed under a one-year written contract that provided for a salary of $100,000; in his twenty-year career in radio before coming to Hartford, Houston had never earned more than $60,000. Houston Dep. at 65; see McDonald Decl. Ex. A.

Before he was hired, Houston traveled to Farmington from Texas, where he had formerly been employed, and spent a week as a guest host on the morning show along with Nancy Barrow, a white female who was nearly 37 and had worked at WZMX since 1998. Houston Dep. at 52. Barrow had previously co-hosted the

---

[1] A complete statement of material undisputed facts is submitted along with this motion, as required by Local Rule 56(a)1.

morning show with another white announcer, whose employment terminated in the spring of 1999. Barrow Dep. at 7. Barrow had been hosting the morning show on her own since that time. Id. at 7-8.

Houston and Barrow instantly came into conflict over what Houston regarded as her insubordination and refusal to take direction from him. He immediately told Salhany that Barrow "is going to be a problem to work with," and demanded that Salhany "sit down with her and spell out for her her duties and responsibilities." Houston Dep. at 81. When Salhany responded that Houston needed to "get used to her" -- it was, after all, only his third day on the job -- he replied, "I don't have to get used to her. She has to get used to me. She is not by herself anymore, okay, I'm in control of the show." Id. at 80, 82.

In May 2000, Houston sent Barrow a written memo with certain instructions about the morning show, which prompted a meeting between Houston, Barrow, and Salhany. Houston Dep. at 85. Salhany told him afterward that memos were "not my [Salhany's] style, . . . if you have problems with Nancy, bring them to me." Id. at 96. Nevertheless, Houston sent Barrow another memo with similar directions in early June. Id. at 97.

WZMX's ratings were relatively low during the first year of Houston's employment, as they had been before his arrival. In rankings of local stations prepared by Arbitron, Inc. for listeners over age 12, including all parts of the day, WZMX placed approximately tenth to fifteenth in the Hartford market. Salhany Dep. at 66-67. WZMX also "was not doing well from a financial standpoint." McDonald Dep. at 53.

**B.    Infinity Changes WZMX From "Dancin' Oldies" To Hip Hop And Agrees To A New Contract And A Raise For Houston.**

In the spring of 2001, station management decided to adopt Salhany's suggestion that they change the format of the station from "dancin' oldies" to hip-

LITDOCS/546876.1

hop and rhythm and blues. McDonald Dep. at 55. Several considerations drove the change. The most important factor was that, although hip-hop "had been around for twenty years and it was an extremely mainstream popular format," there was no other such station in the Hartford market at that time. Id. Infinity believed that there was an opportunity to serve a market that was not well served by existing stations, particularly to appeal to an 18-34 year old demographic and a younger teen demographic. Salhany Dep. at 28-29.[2]   That change in demographic target also removed an overlap in the Infinity stations' coverage; before the format change, WZMX had been targeting the same age range as the other Infinity stations, see Houston Dep. at 147, 150, so the change eliminated that redundancy and gave Infinity broader reach. Houston supported the decision. Id. at 146.

Houston's initial contract had been for one year. Despite the format change, Infinity decided to retain Houston. In the spring of 2001, now age 50, Houston and Infinity agreed to a second contract. McDonald Decl. Ex. B. This new agreement had a two-year term, from 2001 to 2003, and granted Infinity a unilateral option for a third year. Houston received a 20% raise, to $120,000. Houston agreed to the arrangement even though, he says, he had "absolutely" concluded "without a doubt" by 2000 that the station was treating him differently because of his race. Id. at 263-64.

With the new format, but with no change in morning show hosts, WZMX's ratings instantly soared. In the course of one three-month rating period, the station's Arbitron rankings jumped significantly. Salhany Dep. at 67-68.

---

[2] Radio stations routinely track the age and ethnicity of their listeners so as to describe the demographics they reach to advertisers. Houston Dep. at 148. Houston does not contend that that practice is discriminatory or improper. Id. at 149.

C.    **Barrow Broadcasts Incorrect Information; Houston Screams Profanities At Her.**

Meanwhile, tension between Houston and Barrow continued to grow. One morning at the end of May, 2001, Barrow learned that pop star Janet Jackson planned to add a second date to a previously scheduled concert in Hartford. Houston Dep. at 152. She had the information from a source that she and Houston regularly used for news broadcasts during the morning show. Id. at 153; Barrow Dep. at 34-35. She told Houston about the development, and he said "I wouldn't talk about that until it's confirmed." Id. Houston claims that the station's promotions director, Chrissy Johnson, had also suggested that Barrow not broadcast the information. Id. at 155. Barrow, concerned that WZMX would miss out on reporting important news before other stations, broadcast the information anyway. Id. at 154; Barrow Dep. at 39. It would later turn out that the information was erroneous. McDonald Dep. at 59.

In the studio after Barrow broadcast the information, Houston became enraged. Infuriated by "her resisting my direction to do certain things or not do certain things on the show," Houston demanded: "Why are you constantly doing things to piss me off?" Houston Dep. at 156. Barrow responded that she did not take direction from Houston, only from Salhany. Id. Houston then, as he testified, "scream[ed] at the top of my lungs," shouting "F--- you, Nancy Barrow. F--- you." Id. at 157.

Barrow and Houston finished the show, and Barrow, in tears, went to see Salhany. Id. at 162. A few days later, Salhany and McDonald asked to meet with Houston, saying they "want[ed] to get [Houston's] side of what happened." Id. at 166. He testified that he "was really surprised by that" -- the request for the meeting -- "since with all the crying and boohooing that was going on," he "totally thought she [Barrow] was acting totally ridiculous." Id. at 165. After discussing the incident in the meeting, Houston asked if he could make a suggestion "to make this

- 5 -

situation better." Id. at 168. His suggestion was that Salhany and McDonald should get "real management training and real diversity training." Id.

The meeting ended with a written warning to Houston. McDonald Decl. Ex. F. He said he would only accept it if Barrow received a warning as well "for being the provocateur." Id. at 171. McDonald said that would not happen. She acknowledged that "both of you were wrong," but that "you were more wrong than she was." Id. Houston concluded that his managers "don't understand the sensitivity of black people. . . . especially black men." Id. at 174.

### D.    Salhany Takes Houston To Lunch To Discuss The Situation.

On October 24, 2001, Salhany invited Houston to lunch at Japanica, a favorite restaurant of Houston's. Houston Dep. at 380-81. At the lunch Salhany said that he wanted Houston to be at the station for a long time. Id. at 383. He also said that he thought Houston was unhappy, and that if Houston wanted to leave Infinity would pay his costs to relocate. Id. at 382. Houston asked if Salhany had made Barrow the same offer; he said he had not, and that Barrow's contract, which was up for renewal, had been extended. Id. at 385, 387. Houston was offended that the relocation offer would be made to him but not to Barrow, and that he was not consulted on whether Barrow's contract should be renewed. Id. at 387.

### E.    A Female Employee Complains of Sexual Harassment; Houston Responds That She "Has A Problem With Black Men."

In December 2001, a female employee reported to McDonald that Houston had sexually harassed her by putting his arm around her, pulling her close, and then putting his hand on her buttocks. Houston Dep. at 222. McDonald met with him to discuss the allegation. When she described what the employee had complained of, Houston "busted out laughing." Id. "[T]hat bitch is lying," he continued. Id. at 223. He admitted, however, that at least some of what had been described "could have happened," since "we are of a very gregarious group of people

- 6 -

in radio." Id. at 224; see id. at 389 (admitting he put his arm around the employee).

McDonald instructed Houston not to speak to the employee. Id. at 227. Interpreting that instruction narrowly, however, Houston decided to "sen[d] a little note." Id. The "little note" was a memo attaching several verses from the Bible titled "Vengeance Upon Adversaries," and including the verse "Let mine adversaries be clothed with dishonor," which Houston circled. Id. at 228-29; see McDonald Decl. Ex. C. Houston believed -- though he has no facts to support the claim -- that the employee was put up to the accusation by unnamed others "as part of a suppression campaign that was being executed against me to get me out." Id. at 226.

In a subsequent meeting with McDonald, Houston told McDonald that the complaining employee "has a problem with black men," that she "needs psychological counseling," was "delusional," and "may be suffering from posttraumatic stress syndrome" because he imagined that she might have "had an incident" with a black male. Id. at 231-32. He had no factual basis for that accusation, either. Id. at 232.

McDonald did not discipline Houston concerning the incident, except to warn him about his attempt to communicate with the complaining employee. See McDonald Decl. Ex. D.

F.    **Houston Objects To Items In The Control Room, But Does Not Complain To Anyone.**

The walls of the control room, from which WZMX announcers broadcast throughout the day, is heavily decorated with posters from various music artists and their albums. See, e.g., Houston Dep. at 250 ("We have tons of posters in the control room."). At some point early in 2002, a poster advertising an album by Fat Joe was posted on the control room wall. Id. at 245; see McDonald Decl. Ex. E. Fat Joe is a Latino rapper whom Houston calls a "core artist" at WZMX, meaning that his music is played frequently at the station. Id. at 244. The poster had a

- 7 -

handwritten inscription that Fat Joe had written on it during a promotional visit to the station, reading "Craig G, forever trying to look like me. One love, your n----- Fat Joe." Id. at 244-45.[3] Houston claims that he found the inscription offensive, and took the poster off the wall. He did not throw it away, however, but took it to his office. He contends that someone took it from his office and re-posted it in the control room. Id. at 246-47. He did not complain to Salhany or McDonald about it.[4]

At some other point in 2002, Houston found a promotional keychain from the Universal Pictures movie "Undercover Brother" hanging from the microphone that he (and others) used in the control room. Id. at 250-51. Houston says that he was offended by the keychain as well, because he considered it a reference to a lynching, id. at 252-53, though he neither complained about it, nor discussed it with anyone, nor took the keychain off the microphone. Id. at 253-54. He left it hanging for "a couple of weeks" "to see if [some]one else was going to take it down." Id. Eventually it disappeared. Id.

G.    **Houston Files A Claim With The CHRO, Which Finds No Probable Cause To Believe Discrimination Occurred.**

On or about January 11, 2002, Houston filed a claim with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). After investigation, the CHRO dismissed the complaint, finding that "there is no reasonable possibility that further investigation will result in a finding of reasonable cause." McDonald Decl. Ex. G.

---

[3] Craig G is a white employee of WZMX.

[4] A similar poster from an African-American artist, named "Styles," also hung in the control room, bearing the handwritten inscription "Hot 93.7 Fab 4, love you all n-----s, you all holding me down. Styles." Houston testified, however, that he never noticed this poster and accordingly never took it down. Houston Dep. at 250.

- 8 -

### H.    Houston's Contract Is Not Renewed, And He Files This Action.

In February 2003, Houston had a disagreement with Barrow about the control of his microphone.  Both he and Barrow can switch the microphone on and off from their respective stations in the control room.  Houston objected to what he says was Barrow's tendency to cut him off, and told Barrow to leave her switch on at all times, and that he would switch the mike on and off himself.  Houston Dep. at 311.  After giving that instruction, however, he left his microphone on inadvertently and accidentally coughed on the air.  Id. at 312.  He then chastised Barrow for not turning the microphone off, despite his earlier instruction.  Id. at 313.  The incident provoked another meeting with Salhany, which Houston considered "their way of protecting their blue-eyed blond-hair chosen one from the big Black evil Black man."  Id. at 315.

Around the same time, and perhaps in the same meeting, see id. at 315-16, Houston asked whether Infinity was planning "to honor the extension" of his contract.  Salhany told him the company would not renew it.  Id. at 316-17.

On March 31, 2003, Houston served the defendants with the summons and complaint in this action, which he had filed on January 17, 2003.

### III.    ARGUMENT

To prevail on his claims of race discrimination, Houston must prove that Infinity did not exercise its option to renew his contract because of his race, rather than because of his conflicts with his supervisors and co-workers.  He may attempt that proof either by showing sufficient direct evidence of discrimination to convince a jury of an illegal motivation, or by demonstrating, under the familiar McDonnell Douglas burden-shifting standard, that the reasons Infinity has articulated for his

termination are a pretext for race discrimination.[5]   On the undisputed facts, Houston cannot sustain either burden.

Plaintiffs sometimes complain that summary judgment is disfavored in discrimination cases, supposedly because such cases present fact-based questions of motive and intent.   But the Supreme Court repeatedly has emphasized that discrimination cases should be treated like any other, and summary judgment granted where, as here, there is no dispute of material fact.  Although there may often be no eyewitness testimony about the employer's reasons for its action, "none of this means that trial courts . . . should treat discrimination differently from other ultimate questions of fact." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 524 (1993); Reeves, 530 U.S. at 148.   The Second Circuit similarly has rejected the notion that summary judgment is inappropriate in discrimination cases, for "the salutary purposes of summary judgment – avoiding protracted, expensive and harassing trials – apply no less to discrimination than to other areas of litigation." Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  There is no genuine issue of material fact here, and summary judgment should be granted.

## A.    Houston Has No Direct Evidence Of Discrimination.

Direct evidence is "evidence tending to show, without resort to inference, the existence of a fact in question." Tyler v. Bethlehem Steel Corp., 958 F.2d 1176, 1184 (2d Cir. 1992).   In discrimination cases, it takes the form of contemporaneous comments by decisionmakers or other similar evidence that demonstrates directly that a prohibited motivation was at work. See, e.g., Cook v. Arrowsmith Shelburne, Inc., 69 F.3d 1235, 1239 (2d Cir. 1995) (direct comments by decisionmaker of intent to get rid of plaintiff and to cover up his motives, combined with vulgar comments

---

[5] McDonnell Douglas v. Green, 411 U.S. 792, 802-805 (1973); see Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 142 (2000).

about women).  Houston has no such evidence; he has never contended that McDonald or Salhany made any direct reference to his race or age, nor even that less senior managers or colleagues made any such comments or references.  See, e.g., Houston Dep. at 299, 303 (Starr never mentioned Houston's race or age in a derogatory or racist way).  He contends instead that Infinity's decisionmakers, like "white people in general," make racist decisions because "people look at us from a racist point of view from a mindset of inequality."  Houston Dep. at 309-310.  That is not direct evidence of any prohibited motivation.

Houston accordingly must proceed by establishing a prima facie case, which Infinity "may rebut . . . by articulating a legitimate, non- discriminatory reason for the employment action."  Weinstock, 224 F.3d at 42.  When Infinity does so, "the presumption of discrimination arising with the establishment of the prima facie case drops from the picture."  Id.  Houston must then demonstrate with admissible evidence that the reason Infinity has articulated is a mere pretext for discrimination.  Id.  As the Weinstock court characterized plaintiff's burden:

> The plaintiff must produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not discrimination was the real reason for the employment action. In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination. To get to the jury, it is not enough to disbelieve the employer; the factfinder must also believe the plaintiff's explanation of intentional discrimination.

Id. (internal citations, quotation marks, and footnote omitted).  As shown in the following sections, Houston cannot sustain that burden.

## B. There Is No Evidence On Which A Reasonable Jury Could Find Pretext.

Houston was employed at WZMX under a two-year contract that granted Infinity the option, in its sole discretion, to renew the contract for a third year.  Infinity elected not to do so because Houston's managers tired of his unrelenting conflicts with them and with his co-workers.  There can be no dispute that Houston

- 11 -

was in constant battle with his on-air co-host Nancy Barrow, his supervisors Victor Starr, Steve Salhany, and Suzanne McDonald, and others at the station. They are detailed in our statement of facts. In particular, his disagreements with Barrow, he testified, began on the third day after he moved to Hartford and occurred "daily" thereafter. Houston Dep. 79-80, 101.

Houston naturally contends that he was never to blame for these arguments; in every case he was provoked, he says, by Barrow's insubordination or his supervisors' lack of management skills. But this Court need not resolve the question of who started the disagreements. Infinity was free, as a matter of law, to resolve the chronic situation by letting Houston go, blameworthy or not, so long as its decision was not motivated by his race or age. "[A]rguing about the accuracy of the employer's assessment is a distraction, because the question is not whether the employer's reasons for a decision are right but whether the employer's description of its reasons is honest." Kariotis v. Navistar Int'l Transp. Corp., 131 F.3d 672, 677 (7th Cir. 1997) (emphasis and citation omitted).[6]

On that critical question, there simply is no evidence on which a reasonable jury could find pretext. We review several aspects of the issue in turn.

> **1.    Houston Charges Discrimination Against The Same Individuals Who Hired And Promoted Him Shortly Before His Termination.**

At the outset, the individuals who decided not to renew Houston's contract in

---

[6] See also Chapman v. AI Transport, 229 F.3d 1012, 1030 (11th Cir. 2000) ("Provided that the proffered reason is one that might motivate a reasonable employer, an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason.") (collecting cases); Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998) (anti-discrimination law "does not make [defendants] liable for doing stupid or even wicked things; it make them liable for discriminating"); Wolf v. Buss (America) Inc., 77 F.3d 914, 919 (7th Cir. 1996) ("Pretext means more than a mistake on the part of the employer; pretext 'means a lie, specifically a phony reason for some action.'") (quoting Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir.1995)).

LITDOCS/546876.1

February 2003 -- Salhany and McDonald -- were the same individuals who had hired him less than three years before, in April 2000, and the same individuals who had signed him to a new two-year contract with a pay raise in 2001. McDonald Decl. ¶¶3, 10. The idea that Salhany and McDonald were sufficiently free of racial and age bias to hire Houston in 2000 and increase his pay in 2001, but then were motivated by bigoted hostility to older African-Americans in 2003, is so implausible that the law presumes it to be an unwarranted inference. As the Second Circuit held in Grady v. Affiliated Central, Inc., 130 F.3d 553, 560 (2d Cir. 1997), such facts "strongly suggest that invidious discrimination was unlikely." Though not conclusive, the presumption is "highly relevant" in evaluating the plaintiff's case. Schnabel v. Abramson, 232 F.3d 83, 91 (2d Cir. 2000) (applying the presumption where, as here, plaintiff had been hired three years before termination by same individuals).

2. **Houston Has No Evidence To Support His Claim That Infinity Systematically Mistreated African-American Employees.**

Houston apparently does not claim that he was *singled out* for mistreatment because of his race; rather, he claims that he was discriminated against because of a pervasive attitude of hostility toward African-Americans *in general.* "They were not looking for black people to work for them," he testified; his supervisors "[didn't] understand the sensitivity of black people. . . . especially black men." Houston Dep. 191, 174. Yet Houston was not the only African-American on-air personality at WZMX; he broadcast in the morning while Carl Daniel, known as "Kid Fresh," and Linda Reynolds are on air in the evenings and at night, respectively. McDonald Decl. ¶5. He has no evidence that any other African-American announcer -- or, for that matter, any other African-American employee -- was mistreated. Houston Dep. at 178-79 (no other employee alleged discrimination in conversations with him). Indeed, Houston complains that Kid Fresh was treated more favorably than he in

assignments for appearances outside the station. Id. at 195. There is accordingly no evidence of any systematic bias against African-Americans at the station.

Further, after deciding not to renew contracts with Houston and with WZMX's white Program Director, Victor Starr, the station hired an African-American, Tim Collins (known as "DJ Buck") to work as Assistant Program Director. McDonald Decl. ¶6. Collins is also on the air both in the afternoon daypart and often in the mornings with Barrow. Id.[7]

### 3. Houston Cannot Prove He Was Discriminated Against As Compared To Similarly Situated Individuals.

Lacking any direct evidence, a disparate treatment plaintiff "must show that he was treated differently than other similarly situated employees who violated work rules of comparable seriousness." Aramburu v. The Boeing Co., 112 F.3d 1398, 1404 (10th Cir. 1997). Plaintiff and the proposed comparators must be "similarly situated in all material respects." Shumway v. UPS, Inc., 118 F. 3d 60, 64 (2d Cir. 1997); see also Byrd v. Ronayne, 61 F.3d 1026, 1032 (1st Cir. 1995) (comparators must be "similarly situated in all relevant respects," including "in terms of performance, qualifications and conduct, without such differentiating or mitigating circumstances that would distinguish their situations").

Houston cannot meet this burden. He raises two claims in this regard: that he was paid less than comparable employees, and that he was disciplined more severely than similar employees and ultimately terminated. Neither claim has any evidence to support it.

---

[7] Although plaintiff is not required to demonstrate that he was replaced by someone outside the protected class, Infinity's decision after terminating Houston to hire an African-American for job responsibilities that exceed the plaintiff's tends to negate the inference of discrimination that Houston hopes to raise.

LITDOCS/546876.1

### a.    Houston Has No Evidence Of Discrimination in Pay.

Houston was the highest paid of any on-air personality at WZMX, and in fact was paid more than any employee of that station in any capacity.  McDonald Decl. ¶7.  Unable to complain on that basis, he instead argues that he was paid less, and was allowed fewer perquisites, than hosts of the morning shows at the other Infinity stations in Hartford.  The claim fails because those individuals were not "similarly situated in all material respects" so as to permit a comparison.

At the outset, Houston actually was paid more than Allen Camp, host of the morning show on WRCH, even though Camp had responsibility not only for the morning show but also as program director for the station, Houston Dep. at 354-55.  That relative ranking is particularly telling because WRCH is the highest billing Infinity station in Hartford and WZMX bills the least.  McDonald Dep. at 76; McDonald Decl. ¶7.

Unable to compare himself to anyone at his own station or at WRCH, Houston principally takes aim at Gary Craig, host of the morning show on WTIC-FM, who was paid $360,000 per year during a time period in which Houston was receiving approximately $120,000 per year.  McDonald Decl. ¶8 & Ex. B.  But the two situations could hardly be more different, for several reasons.

First, the two work at different stations, playing different kinds of music with different representation in the Hartford market.  McDonald Decl. ¶11.  When Houston was employed at WZMX, it was the only station in Hartford playing hip-hop music.  A listener who wanted to hear such music had only one choice, regardless of the personality of the disc jockey, whom the station accordingly deemed essentially interchangeable.  Id.  In contrast, WTIC-FM played "adult contemporary" music, a genre that was well represented at other stations in Hartford.  WTIC-FM accordingly needed some other factor to attract audiences, and it relied on Gary Craig's popular morning show for that purpose.  Id.

- 15 -

Second, Gary Craig had a proven track record at Infinity. Id. ¶10. He had been employed at WTIC-FM since 1981, and had a consistent record of generating solid ratings. Id. He had also been employed by Ms. McDonald at a predecessor of Infinity, and left for a time; when he did, that station's ratings fell dramatically but rose again when he returned. Id. By comparison, Houston had no track record in Hartford, nor any seniority with Infinity. His $120,000 salary was double the highest amount he had earned in more than twenty years in radio, see Houston Dep. at 65, and there is no evidence that it was lower than fair market value for an announcer of Houston's experience in the Hartford market at a station playing comparable music and with comparable ratings and advertising revenue to WZMX.[8]

### b.    Houston Has No Evidence Of Discrimination In The Decision Not To Renew His Contract.

At trial, Houston's burden with respect to the non-renewal of his contract will be to show not only that Infinity has lied about its reasons for that decision, but that its lie is a pretext for discrimination. He must prove not only a false reason, but also "that the asserted pretextual reasons were intended to mask age [and race] discrimination." Schnabel, 232 F.3d at 88. Thus, in Schnabel, the Second Circuit affirmed summary judgment, ***despite proof of pretext,*** because the plaintiff offered no basis for a reasonable jury to find that the real reason was age discrimination: there had been no discussion of the plaintiff's age, or age-related criticisms, and the employer had expressly considered the plaintiff's qualifications relative to his replacement. Id. at 91.

The Court came to the same conclusion in Lizardo v. Denny's, Inc., 270 F.3d 94, 104 (2d Cir. 2001), where plaintiffs sued a restaurant claiming that they had not

---

[8] The situations are also different because Victor Starr, who was WZMX's program director and therefore responsible for the morning show, had no responsibility for the morning shows at other Infinity stations. Houston Dep. at 303.

- 16 -

been seated as quickly as white patrons who arrived after them.  Proof of pretext alone was not enough: "If, as plaintiffs contend, the defendants exaggerated or lied about plaintiffs' behavior, the record does not support a finding that they did so to mask race discrimination."  Id.  Houston's claim suffers from the same faults.

On this issue he argues principally that he was treated less favorably than his white co-host, Nancy Barrow, despite her equal or greater responsibility for sparking their heated exchanges.  The argument fails because, even assuming for these purposes that his managers did regularly take Barrow's side, there is no basis for a jury to conclude that they did so *because of Houston's race or age*.  In fact they confronted Houston on several occasions because they believed that he had started the argument or, as in the incident of the Janet Jackson concert announcement, had overreacted.  Houston Dep. at 171.

But even if there were evidence of pretext, which there is not, there is no evidence that that explanation is a cover for discrimination.  Houston's race or age was never mentioned in any of these discussions, nor is there any other reason to believe those factors were considered.

In his deposition, Houston was asked why he believed his alleged mistreatment was racially based: "why don't you think, for example, it might be they just liked Nancy better and they didn't like you?  What is it that makes race part of the equation?"  Houston Dep. 191.  His response reveals the lack of evidentiary basis for his claim: "Because I'm black and she is white."  Id.  That is all the evidence he has: the mere fact of difference in race between himself and his co-host.  "[W]hat makes you think that instead of being just bad managers, unskilled, poorly trained, that they are also racially motivated?" he was asked.  "Because every decision they have made in incidents, situations and circumstances that arose between me and Nancy Barrow fell clearly down that line."  Id.

In the end, Houston sees race at work because he believes all white people

- 17 -

are racist: Victor Starr, the program director, must have been biased against him, because "White people, in general, think of Black people as not being equal to them." Id. at 310. Nancy Barrow, he also believes, has "a problem with black people." Houston Dep. at 93. Even though he admits that Barrow, after hosting the morning show on her own for some months, might have been similarly resistant to a new white co-host, id. at 112, still her resistance to Houston must have been racially motivated. Why? "Because I'm black." Id. at 113. As he testified more broadly, "I believe that white people deal with black people in general from a racist point of view. . . . Q. All white people do that? A. I believe in general." Id. at 309.

This sort of generalized belief that race must lie at the bottom of every management decision is not enough to reach a jury. It is true that Reeves did away with the notion of "pretext plus" -- the requirement that a plaintiff offer evidence beyond a prima facie case to reach a jury. But the Court also reaffirmed in Reeves that "'[i]t is not enough . . . to disbelieve the employer; the factfinder must believe the plaintiff's explanation of intentional discrimination.'" 530 U.S. at 147 (quoting Hicks, 509 U.S. at 519) (original emphasis). Just as there is no per se rule that a plaintiff must do more than establish a prima facie case and evidence of pretext, 530 U.S. at 147-48, so also there is no per se rule that a plaintiff with some evidence of pretext must as a matter of law be permitted to reach the jury. Schnabel, 232 F.3d at 90. Because the plaintiff retains the burden of proving discrimination, not just pretext, the mere existence of evidence suggesting pretext does not preclude summary judgment where the plaintiff offers "only a weak issue of fact" or where there is other dispositive evidence supporting the legitimate reasons advanced by the employer. Reeves, 530 U.S. at 148. As the Second Circuit said in Lizardo: "Plaintiffs have done little more than cite to their mistreatment and ask the court to conclude that it must have been related to their race. This is not sufficient." 270 F.3d at 104. That is exactly what Houston asks this Court to do.

In this case, even if Houston had been able to muster sufficient evidence to demonstrate pretext, "the jury 'would be left to guess at the reasons behind the pretext.'" Feliciano De La Cruz v. El Conquistador Resort And Country Club, 218 F.3d 1, 9 (1st Cir. 2000) (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 10 (1st Cir. 1990)). There is no hint anywhere in the record that those who decided not to renew Houston's contract were motivated by his race or his age; the only evidence is that they tired of his constant conflict with them and with others at the station. Title VII is not violated by "an effort to impose a code of workplace civility," and the existence of "personality conflicts with numerous co-workers" does not create a hostile environment, much less proof of disparate treatment, especially where there is "little more than speculation and conjecture to make the required connection from the mistreatment [alleged] to a gender or race-based animus." Palesch v. Missouri Comm'n on Human Rights, 233 F.3d 560, 567-68 (8th Cir. 2000).[9] That is precisely what Houston's position rests on here: his generalized, subjective, and rather discriminatory assumption that all white people "think of black people as not being equal to them," Houston Dep. at 310, and accordingly that his "personality conflicts with numerous co-workers" must have been motivated by racial hostility.

That is not enough to reach a jury. In James v. New York Racing Assn., 233 F.3d 149, 152 (2d Cir. 2000), the plaintiff claiming age discrimination challenged the employer's "downsizing" explanation by showing that after he was fired, a

---

[9] See also Bradley v. Widnall, 232 F.3d 626, 632 (8th Cir. 2000) (rejecting hostile environment claim where "the record reveals that the majority of the problems encountered by Bradley stemmed from inter-office politics and personality conflicts rather than race based animus"); Brady v. KBI Security Services, Inc., 91 F. Supp. 2d 504 (E.D.N.Y. 2000) ("[Defendant] may have harassed, insulted and criticized [plaintiff], but Title VII does not make employees liable for being mean or petty . . . .") (quoting Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp. 2d 249, 263 (E.D.N.Y. 1999)).

- 19 -

younger employee was hired to perform almost the same job, at the same desk and with the same secretary. The court held that this evidence "arguably would allow a reasonable factfinder to conclude that [the employer's] explanation of downsizing is false," id. at 157, but, analyzing Reeves, nevertheless affirmed summary judgment because the plaintiff had failed to offer evidence on which a jury could base a finding that discrimination was the real reason, in the face of other evidence of a bona fide reduction in force and recent hires of older workers. Id. at 152-53, 157.[10]

Here, Houston cannot even show that Infinity's expressed reasons for his termination -- that it sought to remove an individual who had created a storm of conflict and hostility -- are false. But even if he could have done so, his claim, just as in James, suffers from a lack of evidence that race or age lurked behind the articulated reason. Like James, Houston offers no evidence that provides a basis for a jury to conclude that the real reason for his termination was some prohibited consideration. There is nothing material for a jury to decide, and defendants are entitled to summary judgment.

### c. Houston Has No Evidence Of Discrimination On The Basis Of Age.

Separately from his claim concerning the non-renewal of his contract, Houston claims that Infinity discriminated against him on the basis of age by denying him appearances at local nightclubs and other venues in favor of younger talent. As with his race claim, the age discrimination claim rests entirely on the mere fact that he was older than those he claims the station favored, and he has no evidence that his age had anything to do with it.

---

[10] See also Campbell v. Dominick's Finer Foods, Inc., 85 F. Supp. 2d 866, 874 (N.D. Ill. 2000) ("Even assuming arguendo that the challenged conduct did amount to harassment, it is still not actionable, as there simply was nothing intrinsically or extrinsically racial about it. Plaintiff has not shown any racial component to [defendant's] treatment of him.").

- 20 -

Houston claims that in a few instances a nightclub owner called the station asking that he appear at the club on a certain evening, and that the station told the owner that Houston was not available that day, suggesting that the club should use one of the station's other announcers, generally Kid Fresh or Jenny Munro (known as "Jenny Boom Boom") instead.

Houston admits, however, that he has no reason to believe the station told the club owners to use the other announcers *because they were younger*. Specifically asked in deposition "[d]id they say, 'Get someone younger,' or did they instead say, 'Use Jenny Boom Boom or Kid Fresh'?," Houston admitted it was the latter. Houston Dep. at 196. Why, then, does he believe that the appearance assignments were motivated by age? Because "[t]hese people are all younger than me." Id. And that difference in age must have been the reason for the assignment simply because "[t]hey had no other reason." Id.[11]

As with his race claims, the mere fact of a difference in age, without some basis to believe Infinity considered that difference, is not enough to reach a jury. Even assuming that Infinity's response -- that club owners were not told Houston was unavailable when they asked for him -- is a pretext, "plaintiff has not demonstrated that the asserted pretextual reasons were a intended to mask age discrimination." Schnabel, 232 F.3d at 88. Any number of other legitimate reasons might have been behind such a decision -- a desire to give the opportunity for appearance income to lower-paid employees of the station, for example, or to favor those who did not have to be on the radio early the next morning, as Houston did.

---

[11] Houston also alleges that Salhany at one time told him he did not think Houston "can relate to these younger kids," Houston Dep. at 201, but the context of the conversation was Salhany's suggestion that Houston adopt more aggressive language, which Houston refused to do. Id. at 203-204. Program director Victor Starr similarly pressed Houston to make the show more aggressive. Id. at 291.

LITDOCS/546876.1

Houston has no evidence on which a jury could select the unlawful explanation from among the lawful explanations, and Infinity accordingly is entitled to summary judgment.

Further, the "same actor" inference discussed in Section B.1., above, applies with special force in age cases. See, e.g., Schnabel, 232 F.3d at 91. Here, not only did Infinity management elect to hire Houston at 49 and enter a new contract with him at 50, but during his first year of employment the station gave him numerous appearances: "When we were [playing] dancin' oldies, people requested me by name all along. No problem. . . . There were times when I was out in the community three and four nights in a row." Houston Dep. at 196-97. The assignments stopped "all of a sudden," he claims, id. at 197. Apparently he contends that his supervisors "sudden[ly]" developed an age bias against him that they had not had before. He offers no evidence to support that conclusion or to explain why those who had hired and promoted him would suddenly adopt an ageist attitude. His age discrimination claim lacks any evidence to support it, and summary judgment is appropriate.

### 4.    Houston's Statistical Evidence Is Irrelevant.

In deposition questioning, Houston explored the idea that WZMX, the station at which he worked, is more diverse than the three other Infinity stations in Hartford. If he means to attempt some statistical argument on that basis, it should be rejected. Statistical evidence, though admissible, is rarely dispositive of summary judgment in a disparate treatment case, and to be relevant must reveal "a stark pattern of discrimination unexplainable on grounds other than [race]." Aragon v. Republic Silver State Disposal, 292 F.3d 654, 663 (9th Cir. 2002); see Raskin v. Wyatt Co., 125 F.3d 55, 67 (2d Cir. 1997) (prima facie evidence "where gross statistical disparities can be shown") (quoting Hazelwood School Dist. v. U.S., 433 U.S. 299, 307-08 (1977)). Houston fails to meet that standard here, for two reasons.

- 22 -

First, statistical evidence is only probative of discrimination if it excludes other explanations for observed disparities.  See, e.g., Smith v. Xerox Corp., 196 F.3d 358, 371 (2nd Cir. 1999) ("plaintiffs' statistical analyses fail to account for other possible causes for the fact that older (or male) workers were more likely to be terminated"); Hollander v. American Cyanamid Co., 172 F.3d 192, 203 (2nd Cir. 1999) (same); Raskin, 125 F.3d  at 67-68.  Houston's evidence does not do that. There is no evidence in the record, for example, to show whether WZMX employs a higher percentage of African-Americans than the other stations because it has had more African-American applicants for employment.

Second, even assuming (despite the total lack of evidence) that Infinity had a practice of hiring more African-Americans at WZMX, the inference does not support Houston's case but undermines it.  Evidence that Infinity sought to make WZMX more diverse -- or, more pejoratively, hired fewer African-Americans at the other stations -- does not suggest racial animus in terminating an African-American employee from WZMX.  Plaintiff's statistical evidence is irrelevant.

## IV.    CONCLUSION

For all of the foregoing reasons, defendants' motion for summary judgment should be granted, and judgment should enter for defendants on all counts of plaintiff's complaint.

- 23 -

Respectfully submitted,

**INFINITY RADIO LICENSE, INC.,**
**d/b/a WZMX/FM HOT 93.7**
**VIACOM, INC.**
**INFINITY BROADCASTING CORP.**
**INFINITY RADIO, INC.**
**INFINITY MEDIA CORP.**
**CBS RADIO, INC.**

By their attorneys,

Mark W. Batten [ct24751]
Kimberly M. White [ct24375]
**BINGHAM MCCUTCHEN LLP**
One State Street
Hartford, CT 06103
(860) 240-2700

Dated: April 26, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served, by Federal Express this 26th day of April, 2004 on the following:

Francis A. Miniter, Esq.
Miniter and Associates
100 Wells Street - Suite 1D
Hartford, CT  06103

Mark W. Batten

LITDOCS/546876.1