UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED
2004 APR 27 A 11: 15
U.S. DISTRICT COURT
HARTFORD, CT.

| | |
|---|---|
| WENDELL "JD" HOUSTON,<br><br>       Plaintiff,<br><br> v.<br><br>INFINITY RADIO LICENSE, INC.,<br>d/b/a WZMX/FM HOT 93.7, VIACOM, INC.,<br>INFINITY BROADCASTING CORPORATION,<br>INFINITY RADIO, INC., INFINITY MEDIA<br>CORPORATION and CBS RADIO, INC.,<br><br>       Defendants. | CIVIL ACTION<br>NO. 303-CV-0130 (AWT) |

### DEFENDANTS' LOCAL RULE 56(A)1 STATEMENT

Pursuant to Local Rule 56(a)1, defendants (collectively, "Infinity") hereby submit this statement of undisputed facts in support of their motion for summary judgment.

1. Infinity owns four radio stations in the Hartford area: WTIC-FM, WTIC-AM, WRCH, and WZMX. Deposition of Wendell Houston ("Houston Dep.") at 79. (All deposition excerpts are attached to the Declaration of Mark W. Batten).

2. Steven Salhany is the Operations Manager for the four stations. He reports to the Senior Vice President, Suzanne McDonald. Deposition of Suzanne McDonald ("McDonald Dep.") at 3, 14.

3. Both McDonald and Salhany work from Infinity's offices in Farmington, Connecticut, and all four stations broadcast from there. Declaration of Suzanne McDonald ("McDonald Decl.") ¶2.

4. Salhany, in consultation with McDonald, hired the plaintiff, Wendell "J.D." Houston, in April 2000. McDonald Dep. at 48. The plaintiff is an African-American who was then five months from his 50th birthday. McDonald Decl. ¶4.

LITDOCS/547767.1

5. Houston was hired to host the morning show on WZMX, which was then playing music known in the industry as "dancin' oldies." Houston Dep. at 62.

6. Houston was employed under a one-year written contract that provided for a salary of $100,000. McDonald Decl. Ex. A.

7. In his twenty-year career in radio before coming to Hartford, Houston had never earned more than $60,000. Houston Dep. at 65.

8. Before he was hired, Houston traveled to Farmington from Texas, where he had formerly been employed, and spent a week as a guest host on the morning show along with Nancy Barrow, a white female who was nearly 37 and had worked at WZMX since 1998. Houston Dep. at 52.

9. Barrow had previously co-hosted the morning show with another white announcer, whose employment terminated in the spring of 1999. Barrow Dep. at 7. Barrow had been hosting the morning show on her own since that time. Id. at 7-8.

10. By the third day of his employment, Houston came into conflict with Barrow over what Houston regarded as her insubordination and refusal to take direction from him. He told Salhany that Barrow "is going to be a problem to work with," and demanded that Salhany "sit down with her and spell out for her her duties and responsibilities." Houston Dep. at 81.

11. Salhany responded that Houston needed to "get used to her." Houston replied, "I don't have to get used to her. She has to get used to me. She is not by herself anymore, okay, I'm in control of the show." Id. at 80, 82.

12. In May 2000, Houston sent Barrow a written memo with certain instructions about the morning show, which prompted a meeting between Houston, Barrow, and Salhany. Houston Dep. at 85.

13. Salhany told Houston after the May 2000 meeting that memos were "not my [Salhany's] style, ... if you have problems with Nancy, bring them to me." Id. at 96. Nevertheless, Houston sent Barrow another memo with similar directions

LITDOCS/547767.1

in early June. Id. at 97.

14.  WZMX's ratings were relatively low during the first year of Houston's employment, as they had been before his arrival. In rankings of local stations prepared by Arbitron, Inc. for listeners ages 12 and over, including all parts of the day, WZMX placed approximately tenth to fifteenth in the Hartford market. Salhany Dep. at 66-67.

15.  During 2000 WZMX also "was not doing well from a financial standpoint." McDonald Dep. at 53.

16.  In the spring of 2001, station management decided to adopt Salhany's suggestion that they change the format of the station from "dancin' oldies" to hip-hop and rhythm and blues. McDonald Dep. at 55.

17.  Several considerations drove the change. The most important factor was that, although hip-hop "had been around for twenty years and it was an extremely mainstream popular format," there was no other such station in the Hartford market at that time. Id.

18.  Infinity believed that there was an opportunity to serve a market that was not well served by existing stations, particularly to appeal to an 18-34 year old demographic and a younger teen demographic. Salhany Dep. at 28-29.

19.  Radio stations routinely track the age and ethnicity of their listeners so as to describe the demographics they reach to advertisers. Houston Dep. at 148. Houston does not contend that that practice is discriminatory or improper. Id. at 149.

20.  The change in WZMX's demographic target also removed an overlap in the Infinity stations' coverage. Before the format change, WZMX had been targeting the same age range as the other Infinity stations, see Houston Dep. at 147, 150, so the change eliminated that redundancy and gave Infinity broader reach. Houston supported the decision. Id. at 146.

21. Houston's initial contract had been for one year. Despite the format change, Infinity decided to retain Houston. In the spring of 2001, now age 50, Houston and Infinity agreed to a second contract. McDonald Decl. Ex. B.

22. The new contract had a two-year term, from 2001 to 2003, and granted Infinity a unilateral option for a third year. Houston received a 20% raise, to $120,000. Id.

23. Houston agreed to the arrangement even though, he says, he had "absolutely" concluded "without a doubt" by 2000 that the station was treating him differently because of his race. Id. at 263-64.

24. With the new format, but with no change in morning show hosts, WZMX's ratings instantly soared. In the course of one three-month rating period, the station's Arbitron rankings jumped significantly. Salhany Dep. at 67-68.

25. One morning at the end of May, 2001, Barrow learned that pop star Janet Jackson planned to add a second date to a previously scheduled concert in Hartford. Houston Dep. at 152. She had the information from a source that she and Houston regularly used for news broadcasts during the morning show. Id. at 153; Barrow Dep. at 34-35.

26. Barrow told Houston about the development, and he said "I wouldn't talk about that until it's confirmed." Houston Dep. at 153. According to Houston -- and not contested for purposes of defendants' summary judgment motion -- the station's promotions director, Chrissy Johnson, had also suggested that Barrow not broadcast the information. Id. at 155.

27. Barrow, concerned that WZMX would miss out on reporting important news before other stations, broadcast the information anyway. Id. at 154; Barrow Dep. at 39.

28. It would later turn out that the information was erroneous. McDonald Dep. at 59.

29. In frustration at what he testified was Barrow's "resisting my direction to do certain things or not do certain things on the show," Houston demanded of her: "Why are you constantly doing things to piss me off?" Id. at 156.

30. Barrow responded that she did not take direction from Houston, only from Salhany. Id. Houston then, as he testified, "scream[ed] at the top of my lungs," shouting "F--- you, Nancy Barrow. F--- you." Id. at 157.

31. Barrow and Houston finished the show, and Barrow then, in tears, went to see Salhany. Id. at 162.

32. A few days later, Salhany and McDonald asked to meet with Houston, saying they "want[ed] to get [Houston's] side of what happened." Id. at 166. He testified that he "was really surprised by that" -- the request for the meeting -- "since with all the crying and boohooing that was going on," he "totally thought she [Barrow] was acting totally ridiculous." Id. at 165.

33. After discussing the incident in the meeting, Houston asked if he could make a suggestion "to make this situation better." Id. at 168. His suggestion was that Salhany and McDonald should get "real management training and real diversity training." Id.

34. The meeting ended with a written warning to Houston. McDonald Decl. Ex. F.

35. Houston said he would only "accept" the warning if Barrow received a warning as well "for being the provocateur." Id. at 171. McDonald said that would not happen. She acknowledged that "both of you were wrong," but that "you were more wrong than she was." Id.

36. Houston concluded that his managers "don't understand the sensitivity of black people. . . . especially black men." Id. at 174.

37. On October 24, 2001, Salhany invited Houston to lunch at Japanica, a favorite restaurant of Houston's. Houston Dep. at 380-81.

38. At the lunch Salhany said that he wanted Houston to be at the station for a long time. Id. at 383.

39. Salhany also said that he thought Houston was unhappy, and that if Houston wanted to leave Infinity would pay his costs to relocate. Id. at 382.

40. Houston asked if Salhany had made Barrow the same offer; he said he had not, and that Barrow's contract, which was up for renewal, had been extended. Id. at 385, 387.

41. Houston was offended that the relocation offer would be made to him but not to Barrow, and that he was not consulted on whether Barrow's contract should be renewed. Id. at 387.

42. In December 2001, a female employee reported to McDonald that Houston had sexually harassed her by putting his arm around her, pulling her close, and then putting his hand on her buttocks. Houston Dep. at 222.

43. McDonald met with Houston to discuss the allegation. When she described what the employee had complained of, Houston "busted out laughing." Id. "[T]hat bitch is lying," he continued. Id. at 223.

44. Houston admitted, however, that at least some of what had been described "could have happened," since "we are of a very gregarious group of people in radio." Id. at 224; see id. at 389 (admitting he put his arm around the employee).

45. McDonald instructed Houston not to speak to the employee. Id. at 227. Interpreting that instruction narrowly, however, Houston decided to "sen[d] a little note." Id. The "little note" was a memo attaching several verses from the Bible titled "Vengeance Upon Adversaries," and including the verse "Let mine adversaries be clothed with dishonor," which Houston circled. Id. at 228-29; see McDonald Decl. Ex. C.

46. In a subsequent meeting with McDonald, Houston told McDonald that the complaining employee "has a problem with black men," that she "needs

psychological counseling," was "delusional," and "may be suffering from posttraumatic stress syndrome" because he imagined that she might have "had an incident" with a black male. Id. at 231-32.

47. Houston had no factual basis for the accusations set forth in the previous paragraph. Id. at 232.

48. McDonald did not discipline Houston concerning the incident, except to warn him about his attempt to communicate with the complaining employee. McDonald Decl. Ex. D.

49. The walls of the control room, from which WZMX announcers broadcast throughout the day, are heavily decorated with posters from various music artists and their albums. See, e.g., Houston Dep. at 250 ("We have tons of posters in the control room.").

50. At some point early in 2002, a poster advertising an album by Fat Joe was posted on the control room wall. Id. at 245; see McDonald Decl. Ex. E.

51. Fat Joe is a Latino rapper whom Houston calls a "core artist" at WZMX, meaning that his music is played frequently at the station. Id. at 244.

52. The poster had a handwritten inscription that Fat Joe had written on it during a promotional visit to the station, reading "Craig G, forever trying to look like me. One love, your n----- Fat Joe." Id. at 244-45.

53. Houston claims that he found the inscription offensive, and took the poster off the wall. He did not throw it away, however, but took it to his office. He contends that someone took it from his office and re-posted it in the control room. Id. at 246-47. He did not complain to Salhany or McDonald about it.

54. A similar poster from an African-American artist, named "Styles," also hung in the control room, bearing the handwritten inscription "Hot 93.7 Fab 4, love you all n-----s, you all holding me down. Styles." Houston testified, however, that he never noticed this poster and accordingly never took it down. Houston Dep. at

250.

55. At some point in 2002, Houston found a promotional keychain from the Universal Pictures movie "Undercover Brother" hanging from the microphone that he (and others) used in the control room. Id. at 250-51.

56. Houston claims that he was offended by the keychain as well, because he considered it a reference to a lynching, id. at 252-53.

57. Houston did not complain about the keychain, nor did he discuss it with anyone, nor did he take the keychain off the microphone. Id. at 253-54.

58. Houston left the keychain hanging for "a couple of weeks" "to see if [some]one else was going to take it down." Id. Eventually it disappeared. Id.

59. On or about January 11, 2002, Houston filed a claim with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). After investigation, the CHRO dismissed the complaint, finding that "there is no reasonable possibility that further investigation will result in a finding of reasonable cause." McDonald Decl. Ex. G.

60. In February 2003, Houston had a disagreement with Barrow about the control of his microphone. Both he and Barrow can switch the microphone on and off from their respective stations in the control room. Houston objected to what he says was Barrow's tendency to cut him off, and told Barrow to leave her switch on at all times, and that he would switch the mike on and off himself. Houston Dep. at 311.

61. After giving that instruction, however, Houston left his microphone on inadvertently and accidentally coughed on the air. Id. at 312. He then chastised Barrow for not turning the microphone off, despite his earlier instruction. Id. at 313.

62. The incident provoked another meeting with Salhany, which Houston considered "their way of protecting their blue-eyed blond-hair chosen one from the

big Black evil Black man." Id. at 315.

63.  Around the same time, and perhaps in the same meeting, see id. at 315-16, Houston asked whether Infinity was planning "to honor the extension" of his contract. Salhany told him the company would not renew it. Id. at 316-17.

64.  On March 31, 2003, Houston served the defendants with the summons and complaint in this action, which he had filed on January 17, 2003.

65.  Neither Salhany nor McDonald nor Victor Starr, the program director at WZMX, ever made any direct reference to Houston's race or age. See, e.g., Houston Dep. at 299, 303 (Starr never mentioned Houston's race or age in a derogatory or racist way).

66.  Houston was not the only African-American on-air personality at WZMX; he broadcast in the morning while Carl Daniel, known as "Kid Fresh," and Linda Reynolds are on air in the evenings and at night, respectively. McDonald Decl. ¶5.

67.  Houston has no evidence that any other African-American announcer -- or, for that matter, any other African-American employee -- was mistreated. Houston Dep. at 178-79 (no other employee alleged discrimination in conversations with him).

68.  Houston was assigned numerous appearances outside the station during his first year. Houston Dep. at 196-97 ("When we were [playing] dancin' oldies, people requested me by name all along. No problem. . . . There were times when I was out in the community three and four nights in a row."). The assignments stopped "all of a sudden," he testified. Id. at 197.

69.  After deciding not to renew contracts with Houston and with WZMX's white Program Director, Victor Starr, the station hired an African-American, Tim Collins (known as "DJ Buck") to work as Assistant Program Director. McDonald Decl. ¶6. Collins is also on the air both in the afternoon daypart and often in the

mornings with Barrow. Id.

70. Houston was the highest paid of any on-air personality at WZMX, and in fact was paid more than any employee of that station in any capacity. McDonald Decl. ¶7.

71. Houston was paid more than Allan Camp, host of the morning show on WRCH, even though Camp had responsibility not only for the morning show but also as program director for the station, Houston Dep. at 354-55, and even though WRCH is the highest billing Infinity station in Hartford and WZMX bills the least. McDonald Dep. at 76; McDonald Decl. ¶7.

72. When Houston was employed at WZMX, it was the only station in Hartford playing hip-hop music. McDonald Decl. ¶11. Infinity accordingly deemed the disc jockey playing such music to be a less important factor in securing the station's ratings than at other stations. Id.

73. Gary Craig had been employed at WTIC-FM since 1983, and had a consistent record of generating solid ratings. Id. ¶10.

74. Gary Craig had also been employed by McDonald at a predecessor of Infinity, and left in 1992; when he did, that station's ratings fell dramatically but rose again when he returned in 1996. Id.

75. There is no evidence that Houston's salary was lower than fair market value for an announcer of Houston's experience in the Hartford market at a station playing comparable music and with comparable ratings and advertising revenue to WZMX.

76. With respect to Houston's claim that the station denied him opportunities to appear outside the station in favor of younger announcers, he has no evidence that Infinity referred to their relative ages in making assignments or in interacting with club owners requesting the appearances. Houston Dep. at 196.

LITDOCS/547767.1

Respectfully submitted,

**INFINITY RADIO LICENSE, INC.,
d/b/a WZMX/FM HOT 93.7
VIACOM, INC.
INFINITY BROADCASTING CORP.
INFINITY RADIO, INC.
INFINITY MEDIA CORP.
CBS RADIO, INC.**

By their attorneys,

_____
Mark W. Batten [ct24751]
Kimberly M. White [ct24375]
**BINGHAM MCCUTCHEN LLP**
One State Street
Hartford, CT 06103
(860) 240-2700

Dated: April 26, 2004

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing document was served, by Federal Express this 26th day of April, 2004 on the following:

Francis A. Miniter, Esq.
Miniter and Associates
100 Wells Street - Suite 1D
Hartford, CT  06103

_____
Mark W. Batten

- 11 -