UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WENDELL "JD" HOUSTON | : | CIVIL ACTION NO: |
| | | 3:03CV0130(AWT) |
| | : | |
| V. | : | |
| | : | |
| INFINITY RADIO LICENSE INC. | : | |
| d/b/a WZMX HOT 93.7, VIACOM, INC. | : | |
| INFINITY BROADCASTING CORP., | : | |
| INFINITY RADIO, INC., INFINITY | : | |
| MEDIA CORPORATION AND CBS | : | |
| RADIO, INC. | : | July 1, 2004 |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFF'S OBJECTION TO SUMMARY JUDGMENT
(REVISED TO DELETE SEALED MATERIALS)**

**I.    INTRODUCTION:**

The Plaintiff requests that the Court deny the Defendant's Motion for Summary

Judgment for the reasons herein contained.   The Defendants begin their brief by claiming that

Houston believes that "seven words" make up the Plaintiff's "entire case" for race

discrimination  - "Because I'm black and she is white."  As can be seen from the facts below,

the Plaintiff has multiple examples of disparate treatment and blatant racism to support his

beliefs.

**II.    FACTS:**

This action seeks to vindicate the federally protected rights of the plaintiff, Wendell

"JD" Houston, an African American male over the age of 40 years, (see Affidavit of Houston

¶1) to conduct his activities as a popular radio Morning Show host of WZMX/FM HOT 93.7

free from discrimination and retaliation on account of race, color, gender and age. WZMX is

part of Viacom, Inc. whose affiliates include CBS Broadcasting, Inc., VHI, Paramount

Pictures, Nickelodeon, TNN, Blockbuster and MTV.  In Connecticut, WZMX is affiliated and operated jointly with WTIC/FM 96.5, WRCH/FM 100.5 and WTIC/AM 1080.(Affidavit of Houston ¶3 ) At the time this lawsuit was filed, Mr. Houston was employed under a two-year contract that was scheduled for renewal on April 9, 2003.  In retaliation for the filing of this lawsuit, the Defendants failed and refused to renew the Plaintiff's contract.  (Affidavit of Houston ¶4 )

This case must be seen in context. While Mr. Houston came to WZMX with solid credentials, he was not hired because the station liked him, believed his talents were unique or because it had voluntarily developed progressive attitudes towards employing on-air African American talent.  (Affidavit of Houston ¶ 5) Before recruiting Mr. Houston, WZMX had an abysmal record of employing African Americans in an on-air capacity while pursuing a format appealing to African Americans. (Affidavit of Houston ¶5) Under threat of legal action and losing a significant part of its listening audience, WZMX induced Mr. Houston, a highly regarded and experienced African American radio personality in Houston, Texas, to host its "Morning Show." Mr. Houston was hired to appease the critics of WZMX's purposeful exclusion of black on-air talent and to provide window dressing for the station's image.(Affidavit of Houston ¶5)

Like all morning radio personalities, Mr. Houston was employed to use his artistic talent and creative ability to oversee and reshape the structure, content and direction of the "Morning Show." The "Morning Show" is the flagship program of any radio station and its success is of paramount importance.  (Affidavit of Houston ¶6) Yet, from the inception of Mr. Houston's employment, WZMX has continuously frustrated, interfered with and undermined his ability to perform his job; diminished his opportunities for advancement; progressively

2

reduced his community and on-air presence; and fostered and tolerated a hostile work environment. (Affidavit of Houston ¶6) For example, posters using the word "nigger" were hung and re-hung in areas visible to the plaintiff and station management. (Affidavit of Houston ¶6)  No individual defendant did anything about it despite the fact that the control room is glassed-in on all sides and the poster was grossly obvious to all employees. (Affidavit of Houston ¶6) In another instance, a figure depicting the lynching of a black man was deliberately left dangling from the plaintiff's radio microphone at WZMX in plain view of all station employees.  (Affidavit of Houston ¶6) Even Mr. Houston's request to Steve Salhany and Suzanne McDonald that WZMX management undergo diversity training was met with resentment and  indifference. (Affidavit of Houston ¶7)

WZMX has continuously misrepresented itself to the public, in particular, African Americans, in order to gain ratings and advertising revenue by disguising its true identity. (Affidavit of Houston ¶8)   The Plaintiff was told by Steve Salhany that his first order of business was to get the station "in good" with the Urban League.   WZMX shamelessly used the Plaintiff's presence by doing all promotions in the black community, but claiming to target suburban white listeners to increase its ratings while simultaneously discrediting the Plaintiff's work and undermining his ability to perform my job by systematically dismantling his show and eliminating his public appearances. (Affidavit of Houston ¶8) Upon information and belief, defendants Viacom, Infinity Broadcasting, Infinity Radio, Infinity Media and CBS are affiliate companies that, directly or indirectly, establish, control or oversee the employment and personnel polices and procedures of WZMX. (Said defendants are collectively referred to herein as the "defendants").  (Affidavit of Houston ¶9)

At all material times material hereto, the plaintiff was employed by defendant WZMX

as the host of the Morning Show, a radio program with a large listening audience. Prior to

April 7, 2000, the plaintiff was employed as a Morning Radio Host, with a popular radio

station in Houston, Texas, a largely populated area. Plaintiff was a highly experienced, well-

regarded and successful radio entertainment personality who developed a professional

reputation identified with his work. (Affidavit of Houston ¶2)

Meanwhile. WZMX was under intense pressure to recruit African Americans to work

as on-air personalities because of its historical exclusionary employment practices. Under

threat of litigation and to maintain a facade of being interested in the African-American

community, WZMX made efforts over an eight month period to secure the plaintiff's services

as the "Morning Show Host" of its then "Dancin' Oldies" program. (Affidavit of Houston ¶10)

Plaintiff was hired for a one-year term by CBS Radio, Inc., then owner and operator of

WZMX/FM by a written contract effective April 7, 2000. (Affidavit of Houston ¶11) The

plaintiff accepted employment with WZMX with the understanding that he would have

artistic control over the structure, content and direction of the Morning Show, which was

customary at all radio stations. Said control was essential to the plaintiff's professional

reputation. (Affidavit of Houston ¶11)

As a radio host, the plaintiff is identified with the structure, content and direction of

the show and likewise the content of the program is identified with him. In fact, the Morning

Show is the most important day part of any radio station adding to the listening audience,

increasing ratings and spurring advertising revenue. (Affidavit of Houston ¶12) Morning

Show ratings rose significantly while the Plaintiff was employed on the Morning Show at

WZMX. (Affidavit of Houston ¶12) After six months on the station, the Plaintiff received a

bonus based on an increase in the Station's ratings. He also received a second ratings bonus

4

shortly before the Station changed formats to hip hop. (Affidavit of Houston ¶12)

WZMX is an affiliate of several Connecticut radio stations, WRCH/FM 100.5, WTIC/FM, 96.5 and WTIC/AM 1080, each with its own programming and morning shows. The hosts of each of the affiliate Morning Shows are white, as are the entire management staff of WZMX and plaintiff's Morning Show support personnel. The hosts of each morning show have control over the structure, content and direction of their respective morning show programs and are fully supported by station management. (Affidavit of Houston ¶13)

Plaintiff was hired to render and furnish artistic and professional services as an "On-Air Host Personality" in which he had contracted to perform the following duties:

3.    DUTIES

Both when broadcasting and when otherwise representing Employer or Station, Employee shall perform to the best of his ability the following duties:

(a)    Prepare, present, and deliver live and recorded talk shows and other programming requirements, including the voicing of commercials ("Programs");

(b)    Perform all duties required of announcers at Station in technical operations and/or by Federal Communications Commission ("FCC") regulations ... Furthermore, Employee agrees to conform to and abide by the requirements of all laws, rules and regulations applicable to his services, including but not limited to, all rules and regulations of the Federal Communications Commission or any other governmental agency.

(c) Make public appearances, which may be broadcast on Station, that promote and publicize Station or Employer or aid in the selling of commercial time on Station;

(d)    Attend meetings with Station's officers involving the production, direction, and the creation of ideas for Programs, entertainment, advertising and other related fields at reasonable times and without additional compensation in furtherance of the commercial value of the Programs;

(f)    Perform any ancillary duties, consistent with Employee's position, that Employer may, in its sole and subjective discretion, require from time to time,

including but not limited to the occasional dubbing of commercials, in emergency situations, under the direction of Station's Program Director.

Employee's services shall be rendered at the facilities of Station or from such other remote locations as Employer or Station may select.

(Affidavit of Houston ¶14)

At all times thereto, the plaintiff performed his job pursuant to his contract and in a manner consistent with workplace procedures, policies, customs and practices.  However, the plaintiff experienced a continuous and unabated pattern of deliberate disparate and hostile treatment by the defendants based upon race, color and gender.  (Affidavit of Houston ¶15) The plaintiffs authority to oversee and shape the structure, content and direction of the Morning Show programming was undermined from the commencement of his employment for reasons that had nothing to do with any legitimate management prerogative.   (Affidavit of Houston ¶15) The plaintiff's ability to control the conduct of subordinate employees was undermined, particularly as it related to the content of station programming as defined by Federal Law.  (Affidavit of Houston ¶15)

Effective April 9, 2001, WZMX hired the plaintiff for a two-year term with an option to renew for an additional one-year at the conclusion of the two-year term.   (Affidavit of Houston ¶16) The plaintiff's duties under the new contract were not altered, except to add one sentence, which read " (c) Perform other customary duties as may be required to be prepared for on-air and off-air duties."   The plaintiff executed said contract based upon the representations of WZMX that the contract, with the exception of the term, was identical to the previous contract.  (Affidavit of Houston ¶16) After signing the contract, however, the plaintiff was told by Steve Salhany, a WZXM management employee: "We got your ass now." (Affidavit of Houston ¶17) Plaintiff subsequently discovered that the terms of the

6

contract had been altered and was not identical as negotiated as represented by WZMX. (Affidavit of Houston ¶17)

Subsequent to the execution of the second contract, the plaintiff's working environment at WZMX became increasingly hostile and unpredictable.  (Affidavit of Houston ¶18) Plaintiff's authority to control the structure, content and direction of the morning show programming was further and more severely eviscerated by WZMX management.  (Affidavit of Houston ¶18)

The Plaintiff was treated differently than the Morning Show hosts of Defendant's affiliates.  In particular, the Plaintiff was denied input into the content of the morning show in that specific benchmark features that he implemented were systematically removed from his show without justification or explanation; he was denied personal appearances when his presence was specifically requested by clients; he was micro-managed; he was denied control over subordinate employees; he was unsupported in the promotion of the Morning Show and not given personal or proper market value enhancement.  (Affidavit of Houston ¶19)

Unlike the Morning Show hosts of other affiliate stations, the plaintiff has been reprimanded for fulfilling his responsibility to shape the content of programming.   WZMX management has supported and encouraged subordinate employees to routinely interfere in the fulfillment of the plaintiff's contractual duties.  (Affidavit of Houston ¶20)

WZMX management has reprimanded without due process the plaintiff for behavior tolerated and openly approved by other employees under the control of WZMX management. For example, the Plaintiff was reprimanded for cursing at Nancy Barrows when she failed to follow his instructions which caused her to give out misinformation over the air, but when

Barrows <u>repeatedly</u> cursed at Salhany because he cancelled her vacation, she was not reprimanded. (Affidavit of Houston ¶21a)

WZMX has used the plaintiff's name for personal product endorsements for its own pecuniary benefit and without providing the plaintiff with just compensation. For example, the Station used the Plaintiff's name and voice for two weeks to sell the Western Union Valentine's Day campaign at a higher than usual advertising rate and then refused to pay him a talent fee. (Affidavit of Houston ¶21b)

WZMX has made illicit deductions from the plaintiff's pay without consent. (Affidavit of Houston ¶21c)

WZMX has failed to compensate the plaintiff in the same manner as other similarly situated affiliate Morning Show hosts and treated the plaintiff unequally in terms of the award, distribution and allocation of employee benefits.  (Affidavit of Houston ¶21d)

WZMX has fostered and tolerated a racially hostile work environment.   Racially derogatory statements made by employees and racially hostile or offensive conduct are tolerated by management and routinely made without consequence.  (Affidavit of Houston ¶21e) For example, posters using the word "nigger" were hung and re-hung in areas visible to the plaintiff and a figurine depicting the lynching of a black man was left dangling from the plaintiff's radio microphone in plain view of station employees.  (Affidavit of Houston ¶21e) The plaintiff was instructed not to quote the first initial of his on-air assistant's last name (i.e. "Nancy B") due to her objection that it was only appropriate to do so if WZMX was an "urban" a/k/a black radio station.  (*See* Deposition of Houston pp. 91-93;  Affidavit of Houston ¶21e)

The Plaintiff was continually treated differently and more harshly than he co-workers.

8

For example, the Plaintiff was chastised by Steve Salhany over a very positive "feature" article about him in the Hartford Courant. Nancy Barrow, however, was the subject of <u>negative</u> publicity in the Punchline Magazine for being caught onstage in compromising positions with male strippers at the WZMX Ladies Night. Nothing happened to her, plus management backed her up and threatened to sue the magazine for the negative story about Nancy. (See Affidavit of Houston ¶21f).

The Plaintiff received a Letter of Reprimand for saying "f*** you" to Barrow when she defied the Plaintiff's instructions not to run the Janet Jackson story on the morning show. However, when Salhany cancelled Barrow's vacation plans due to impending station business, she called Salhany a "motherf*****' to his face several times. She was not reprimanded. (See Affidavit of Houston ¶21g).

The Plaintiff was told by Steve Salhany in February that his contract was not going to be renewed. He was told this decision had been made in January, which was the same time as he filed this lawsuit. (Affidavit of Houston ¶22)

Racially insensitive remarks made by other on-air personalities have been repeatedly made without reprimand and, in fact, encouraged by WZMX management.(Affidavit of Houston ¶23)

Plaintiff has been subjected to retaliation for suggesting that WZMX management undergo management and diversity training. At all times, upon information and belief, defendants have engaged in a deliberate effort to conceal and otherwise disguise their discriminatory motives from the plaintiff. (Affidavit of Houston ¶24)

The Defendants also discriminated against the plaintiff because of his age. At all times material hereto, the plaintiff was over the age of forty. (Affidavit of Houston ¶26) When

the plaintiff commenced his employment with WZMX in April 2000, the radio programming for the station was "Dancin' Oldies." (Affidavit of Houston ¶26) The target audience was persons from ages 25 to 54.   In March 2001, WZMX changed its format to "Rhythmic CHR (Contemporary Hit Radio), a format that featured "hip hop" and "rhythm and blues" music. (Affidavit of Houston ¶26)

The term "Rhythmic" is code word in the radio music industry for "black music for white people."  (Affidavit of Houston ¶26) As reflected in the plaintiff's bonus structure, WZMX also lowered its target audience from persons 25-54 years old to persons 18-34 years old.  (Affidavit of Houston ¶27) Plaintiff was informed by Salhany, however, that the new target audience also included persons that were in high school, ages 14 to 18 years old. (Affidavit of Houston ¶27)  Salhany said to Plaintiff, "Hell, I'm a 38 year old with 2 kids and I can't relate to them." (Affidavit of Houston ¶27)

Plaintiff soon began being denied personal appearances and other substantially younger WZMX employees were given the assignments. (Affidavit of Houston ¶28; Affidavit of Green ¶5; Affidavit of Yvon Alexandre ¶3; Affidavit of Forbes ¶3-6)  Indeed, WZMX hired younger personalities to substitute for the plaintiff.   (Affidavit of Houston ¶28) When the plaintiff's personal appearances were expressly requested, WZMX management stated that the plaintiff was "not available," but younger employees were. (Affidavit of Houston ¶28; Affidavit of Lumpkin ¶8; Affidavit of Alexandre ¶3; Affidavit of Forbes ¶3-6) The plaintiff was, in fact, available and specifically requested public appearances and the statements of WZMX to the contrary were false and misleading. (Affidavit of Houston ¶28)

The plaintiff was told by Salhaney that WZMX wanted a more youthful approach and that WZMX did not believe that the plaintiff could relate to young people age 18-24.

(Affidavit of Houston ¶29) The plaintiff has been denied personal appearances and WZMX has otherwise made a deliberate effort to reduce the outward connection between it and the plaintiff.  (Affidavit of Houston ¶28-9)

Plaintiff was more than qualified to perform his responsibilities with the new format and his age had nothing to do with his ability to attract a listening audience.  Nonetheless, the plaintiff's age was a motivating factor in the defendant's mistreatment of the plaintiff in the terms and conditions of his employment.  The reasons proffered by the defendants for their treatment of the plaintiff are nothing more than a pretext for unlawful discrimination on account of his age.

## III.     LEGAL STANDARD:

Rule 56(c) of the Federal Rules of Civil Procedure provides for the granting of a summary judgment motion if "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The purpose of summary judgment is to determine whether a trial will be necessary. "The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 247-48 (1986).  However, "[t]he [Plaintiff's] burden of establishing a prima facie case... is not onerous" Fisher v. Vassar College, 114 F.3d. 1332 (2d. Cir. 1997) citing Texas Dept. Of Community Affairs v.  Burdine,  450 U.S. 248, 253 (1981).  In fact, Plaintiff's burden of establishing a prima facie case of discrimination has frequently been described as "minimal." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).

## IV.     ARGUMENT:

11

A.    **HOUSTON HAS DIRECT EVIDENCE OF DISCRIMINATION**.

    1.    **The Affidavit of James Green Provides direct evidence of discrimination against Mr. Houston**

Mr. Green's affidavit sets forth numerous repeated examples of discrimination against Plaintiff.  Defendants would object strenuously to any community oriented suggestion made by Mr. Houston. (Affidavit of Green¶4) Despite a policy applied in favor of all other show hosts (all of whom were white) to allow on-air personalities to appear at events (for a fee) at the specific request of an event organizer or customer, the Defendants deliberately denied Plaintiff participation in this kind of activity, sending instead younger, white women, (Affidavit of Green¶5) or diluted the affect of the event organizer's efforts by refusing to advertise Mr. Houston's appearances at the events or by sponsoring competing events to detract attention to the said event. (Affidavit of Green¶8, 10) This occurred many times, including the following enumerated instances: the New's Years Eve Party (Affidavit of Yvon Allexandre  ¶1-3); the Basketball Hall of Fame event (Affidavit of James Green ¶8 ); First Friday events (Affidavit of James Green ¶9); YMCA summer program (2002) (Affidavit of James Green ¶11); Wallingford, Comedy Show (Affidavit of James Green ¶12).  All of this served to keep Mr. Houston out of the public eye.  In addition, Mr. Green stated that the promotions staff supervisor told the staff not to have any direct contact with Mr. Houston, a shocking command that applied to no one else, certainly not to any of the white on-air personalities.  There is no innocent explanation for such actions by Defendants.  The Defendants wanted an Uncle Tom, a black person who would remain behind the radio microphone and be heard but not seen.  This is further evidenced by the lengths to which Defendant's go to have the white women announcers (Jenny Munro and Nancy Barrow) fake

black accents to give a false impression to the listening audience, while maintaining an essential sense of whiteness and superiority.  (Affidavit of Houston, ¶31 ).

> **2.** **The Affidavit of Ray Lumpkin evidences Discrimination against Plaintiff.**

Ray Lumpkin testified in his affidavit to suffering direct discrimination himself, being told that despite his extensive education and experience in communications and promotions he was not qualified for the position of promotions director, while later learning that a young, white woman, with no experience other than an internship got the job.  (Affidavit of Raymond Lumpkin ¶5 ).  The discrimination of Infinity Broadcasting, especially in Connecticut, was not just widespread, it was downright blatant.

Mr. Lumpkin further testified that it was only pressure from the Urban League that pushed Infinity Broadcasting to hire Mr. Houston.  (Affidavit of Lumpkin ¶4) He, too, knew of instances where the Defendants sabotaged community appearances by Mr. Houston.  In particular, he mentions this in connection with appearances at schools, hospitals and halfway houses, specifying  Manchester Hospital School and the HALO adult Learning Program. (Affidavit of Raymond Lumpkin ¶8 ).

> **3.** **The Affidavit of Plaintiff evidences direct discrimination against him.   Mr. Houston recounts repeated instances of discrimination.**

A.  The poster anonymously put up next to Mr. Houston's seat in the control room that had scribbled on it the words "to all my niggers at 93.7".  Mr. Houston was deeply offended at the word "nigger" appearing there and especially as it was located next to his head in his own workspace.  He removed the poster and placed it in his office.  It was posted again the next day.  He removed it again.  It was posted

13

again the following day.  He removed a third time and this time it stayed down.  No individual defendant did anything about it despite the fact that the control room is glassed-in on all sides and the poster was grossly obvious to all employees. (Affidavit of Houston ¶6)

B.    The Defendants tolerated from the young, white female co-host of the morning show, Nancy Barrow, insolence, insubordination, obscenity and rudeness to Mr. Houston that would never be tolerated if done by the co-hosts of the morning shows for the other three radio stations in the building ( Allan Camp for WRCH-fm - 100.5, Gary Craig for WTIC-fm - 96.5, Ray Dunaway and Diane Smith for WTIC-am - 1080).  Each of the four stations has a main host, who is paid substantially more than the co-host, and whose duties substantially exceed those of the co-host.  The duties of the co-host, in each of the four contracts, includes "assisting in the preparation of the show".  The duties of the host include "preparation of the show".  The two positions are not co-equal and no reasonable person would ever think so.  Yet, when JD Houston took up the insubordination of Nancy Barrow with Steve Salhany, the Operations Manager, he was told "She does not have to get used to you; you have to get used to her."  (See Deposition of Houston at 82).  When Nancy Barrow objected to traveling to Florida on a business trip with Mr. Houston because she was afraid to do so, Suzanne McDonald, the Stations Manager, sided with her instead of telling her to get over her bigotry.  (See Deposition of Houston at 104-

14

8;421-423). When Nancy Barrow repeatedly cut off Mr. Houston's mike while he was speaking, and he objected off air, and she threw a temper tantrum, Mr. Houston was blamed. (See Deposition of Houston at 310-312). When Barrow called Salhany a "motherf*****' to his face several times, she was not reprimanded. (See Affidavit of Houston ¶21g). No matter how outrageous the conduct of Nancy Barrow, no matter how mild the response of Mr. Houston, management found her in the right, and him in the wrong. This behavior can only come from a deeply prejudiced attitude.

C.     Defendants paid Mr. Houston far less than they paid the other morning show hosts, as the following information, taken from the several contracts, demonstrate:

**See Sealed Portions of Plaintiff's Memorandum of Law In Support of His Objection to Summary Judgment p. 1.**

While some differential for time in grade may be justifiable, the differentials just described are without foundation. The Arbitron ratings, which show quarterly market share of audience, do not justify such a differential. In fact, based on market share alone, Mr. Houston and Mr. Craig, the WRCH-FM morning show host should have had the highest pay. None the less, Steve Salhany told Mr. Houston that he would never earn more at the station than he was getting at that time.

D.     Mr. Houston was aware of the diversion of guest appearances and complained about the pattern of activity to no avail. For Example, from

September 2000 to approximately March 2001, the Pyramid Club hired the Plaintiff through Infinity Radio to host events on Saturday nights. The station aired from the Club on Saturday nights in a show called "Club Z." Houston's personality and identity  helped build the business of the Pyramid Club and add to its success.   When the format of the radio station changed to Hip Hop, the station no longer would send JD Houston to events at the Pyramid Club.  After that time, the station would usually send Jenny "Boom Boom" or Kid Fresh to the events sponsored by the Infinity Radio.  The owner of the Pyramid Club, Yvon Alexandre personally requested that JD continue to host "Club Z" but he was told by Kathy Brown that JD Houston was not doing any types of appearances.  After the format change, the station did not send JD to host "Club Z" again.  (See Affidavit of Yvon Alexander ¶¶ 2-3; Affidavit of Forbes¶3.)

E.    Mr. Houston, like the other morning show hosts, often work on weekends, preparing interviews or performances of local talent for broadcast during the following week.  The morning show hosts often received guests at the station for such purpose.  The guests of Mr. Houston were frequently black or other minority.  Mr. Houston was told after this was discovered by Steve Salhany that he could no longer have guests in the station on the weekend.  Mr. Salhany cited the need for safety (implying that black people and other minorities were not to be trusted).  No other on-air person was given this directive.  It was

specific to Mr. Houston.  Not coincidentally, the guests of the other

hosts tended to be white.  (See Affidavit of Houston ¶36)

F.    Mr. Houston obtained an exclusive interview with OJ Simpson, without

paying for the interview, despite the fact that at least one other Hartford

area station offered Mr. Simpson a fee for an interview.  Far from being

pleased at Mr. Houston's ability to attract a nationally known person to

the station, Mr. Houston was told that from then on, all of his

interviews had to be approved in advance.  No other on-air host had

such restrictions on him.  (See Affidavit of Houston ¶25.) We submit

that if Howard Stern, an Infinity host, had obtained the interview for his

show, there would have been no  complaint by management.

H.    Mr. Houston developed and promoted a segment of the morning show

known as the "Daily Power for Living", which was intended to send a

message of empowerment, hope and encouragement to the youth of the

listening community.  (See Affidavit of Lumpkin¶7; Affidavit of Carter

¶6) Defendants took this as their own property and used it nationwide

without compensation or recognition to Mr. Houston.  (See Affidavit of

Houston ¶34.)

I.    Nancy Barrows received a week's training on the Boards when she

became host of the Morning Show.  When the Plaintiff became the host,

he specifically requested training on the Boards from Steve Salhany,

but he was told it was not necessary and he was denied training, thus

attempting to set him up for failure from the very beginning. (See

17

Affidavit of Houston ¶21h.)  All of the other Morning Show hosts (i.e.

Allan Camp, Ray Dunaway and Gary Craig) are trained to run the

control boards and they do so.  The Plaintiff was told by Steve Salhany

that "You're never going to run the board, JD, in fact, you don't run

nothing around here."   (See Affidavit of Houston ¶21h.)

When all of this is gathered together, there is only one conclusion.  Infinity

Broadcasting wanted to dominate the minority listening market, especially the black listening

market, without letting in local black talent, without letting in black celebrities, without

making any connection with the black community, without presenting other than a white face

in public, though the voices surely should appear black.  The hiring of Mr. Houston was a sop

to the Urban League (See Deposition of Houston pp. 76-78; Affidavit of Lumpkin ¶4), but

they did not want him out in public.  They did not want him exercising the privileges accorded

to the other morning show hosts.  They did not want to pay him a fair salary.  They did not

want him reprimanding a young white female co-host with a foul mouth.  They wanted him as

a token black.  When he turned out to be a living, breathing human with a desire to interact

with the community and help people, they did not want him.  When he could attract well-

known black people to the station, they did not want him.  When he wanted anything, they did

not want him.

**B.    THERE IS EVIDENCE ON WHICH A REASONABLE JURY COULD FIND PRETEXT.**

**1.    Houston Charges Discrimination Against the Same Individuals Who Hired and Promoted Him Shortly Before His Termination.**

18

The Defendants argue that the idea that Salhany and McDonald were "sufficiently free of racial and age bias" in 2000 but they were "motivated by bigoted hostility to older African Americans in 2003 is [] implausible."  Plaintiff maintains, however, that Salhany and McDonald were motivated by racial concerns from the very beginning.   The Defendants further argue that the Plaintiff cannot show discrimination because the same individuals who hired him were the same ones who decided not to renew his contract.  However,  the individuals who hired him did so under circumstances where there was intense pressure to recruit African Americans to work as on air personalities because of the station's historical exclusionary employment practices. McDonald and Salhany hired the Plaintiff to maintain a facade of being interested in the African American Community.  Although Mr. Houston came to WZMX with solid credentials, he was not hired because the station liked him, believed his talents were unique or because it had voluntarily developed progressive attitudes towards employing on-air African American talent. Before recruiting Mr. Houston, WZMX had an abysmal record of employing African Americans in an on-air capacity while pursuing a format appealing to African Americans.  Under threat of legal action and losing a significant part of its listening audience, WZMX induced Mr. Houston, a highly regarded and experienced African American radio personality in Houston, Texas, to host its "Morning Show." Mr. Houston was hired to appease the critics of WZMX's purposeful exclusion of black on-air talent and to provide window dressing for the station's image. However, once it was clear that the Plaintiff wanted control over his own program, the facade vanished. Defendant was told not to call his cohost Nancy "B" unless WZMX was considered an "urban," i.e. black, radio station.  This would not be tolerated.  Salhany and McDonald were motivated by racial concerns from the very beginning until the Plaintiff's contract was not

19

renewed.

### 2.    There Is Evidence to Support That Infinity Systematically Mistreated African American Employees.

There is ample evidence to show that the station mistreated its African American employees.  Racially derogatory statements made by employees and racially hostile and offensive conduct was tolerated by management and routinely made by employees without consequence.  For example, posters using the word "nigger" were hung and then re-hung in areas visible to all African American employees.  A figurine depicting a lynching of a black man was left dangling in plain view of all employees.  These are not instances that would be directed at the Plaintiff, but would be offensive to all African Americans (as well as to any socially conscious individual) employed at the station, and as such, constitutes mistreatment.  Just because some African American employees, such as Kid Fresh, were allowed more public appearances than Plaintiff does not mean that they were not also subject to mistreatment.

In addition, Mr. Houston repeatedly  requested that WZMX management undergo diversity training.  Each time, this request was met with indifference.

### 3.    Houston Is Able to Prove That He Was Discriminated Against as Compared to Similarly Situated Individuals.

In order to establish an equal protection violation on the basis of selective prosecution a plaintiff must show that: "(1) compared with others similarly situated, he was selectively treated and (2) such selective treatment was based upon impermissible considerations race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." <u>Estate of Morris v.</u> <u>Dapolito</u>, No. 03 CIV. 6641(WCC), 2004

WL 74480, at *5 (S.D.N.Y. Jan. 12, 2004) (citing <u>LaTrieste Restaurant & Cabaret v. Port Chester</u>, 40 F.3d 587, 590 (2d Cir. 1994)). The Second Circuit has "been careful to apply each prong of the test separately, finding the failure to satisfy either inquiry fatal to plaintiffs claim." <u>A.B.C.</u> <u>Home Furnishings, Inc. v. Town of East Hampton</u>, 964 F. Supp. 697, 702 (E.D.N.Y. 1997) (*citing* <u>Zahra v. Town of Southhold</u>, 48 F.3d 674, 683 (2d Cir. 1995)). As to the first prong of the analysis, to be "similarly situated," the persons "at issue need not be identical, but must be similar in `all material respects.'" <u>DePace v. Flaherty</u>, 183 F. Supp.2d 633, 639-640 (S.D.N.Y. 2002) (quoting <u>Shumway v. United Parcel Service</u>, 118 F.3d 60, 64 (2d Cir. 1997)). "`Exact correlation is neither likely nor necessary;' the test is whether a prudent person would think them roughly equivalent." <u>*Id.*</u> at 640 (quoting <u>Penlyn Dev. Corp, v. Inc. Vill. of Lloyd Harbor</u>, 51 F. Supp.2d 255, 264 (E.D.N.Y. 1999)). "The test is whether a prudent person, looking objectively at the incidents, would think them roughly equivalent and the protagonists similarly situated. Much as in the lawyers art of distinguishing cases, the `relevant aspects' are those factual elements which determine whether reasoned analogy supports, or demands, a like result. Exact correlation is neither likely nor necessary, but the cases must be fair congeners. In other words, apples should be compared to apples.'" <u>A.B.C. Home</u> <u>Furnishings, Inc.</u>, 964 F. Supp. at 702 (quoting <u>Dartmouth</u> <u>Review v. Dartmouth College</u>, 889 F.2d 13, 19 (1st Cir. 1989)).

A plaintiff can raise an inference of discrimination by showing that the employer treated him less favorably than a similarly situated employee outside his protected group. *See* <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000). The employees to be compared must be similar in all material respects, which means that "a plaintiff must show that [his] co-employees were subject to the same performance evaluation and discipline standards . . . [and]

that similarly situated employees who went undisciplined engaged in comparable conduct."
Id. (internal citations omitted). "Comparable" does not mean identical, but it does require the
conduct to be of comparable seriousness. Id. at 40. There must be a "reasonably close
resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a
showing that both cases are identical." Id. at 39. Whether employees are similarly situated is
ordinarily a question for the jury. Id. at 38.

### a.    Houston Can Show Discrimination in Pay.

The Plaintiff has adequate prove of discrimination in pay.  First of all, the employees
of WZMX, as a whole, were paid less than their counterparts at the other stations owned by
Infinity.  Plaintiff alleges that this is because WZMX has many more African American
employees than the other Infinity stations.  Although Plaintiff may have been paid more than
other employees within WZMX, his wages pale in comparison to the on-air personalities at
the "white" stations.

While the Plaintiff compares himself to Gary Craig, the morning host of WTIC-FM.,
the Defendant attempt to differentiate between them.  Craig earned a salary of **** (**See
Sealed Portions of Plaintiff's Memorandum of Law In Support of His Objection to
Summary Judgment p. 1.)**  while Plaintiff earned only $120,000.00, one-third as much,
although they admit that WTIC-FM was not even their highest billing station.  They justify
the enormous salary gap by stating that the station's type of music and Gary Craig's track
record influence his salary.

The Plaintiff has also been a DJ for many years.  Plaintiff was a highly experienced,
well-regarded and successful radio entertainment personality who developed a professional
reputation identified with his work.   WZMX's ratings soared during the time when Plaintiff

was the DJ of the morning show.  Plaintiff's talent and reputation brought good fortune to the station.

The type of music that Plaintiff played on his show was hip-hop, a type of music typically associated with "urban" i.e. black, listeners.  Mr. Craig's show played "adult contemporary" music, a genre that was "well represented" by other Hartford stations, one could say because it appealed to the masses, i.e. the majority, non-minority, listening public.

The differences between the Plaintiff and Mr. Craig all come back to racial issues, as does the difference in pay.

> **b.     Houston Has Evidence of Discrimination in the Decision Not to Renew His Contract.**

The Defendants argue that the Plaintiff cannot show evidence that there was discrimination in the decision not to renew his contract.  This is untrue.  The Plaintiff can show discrimination in the decision not to renew his contract.  The Plaintiff alleges that the failure to renew was based on retaliation for the filing of the present lawsuit.  This suit was filed on January 17, 2003.  Plaintiff was informed in February of 2003 that the decision not to renew his contract had been made the month before.  The timing of the decision not to renew his contract is evidence of retaliation.  "[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." Gorman-Bakos v. Cornell Coop. Extension of Schenectady County, 252 F.3d 545, 554 (2d Cir. 2001) (internal quotation omitted); *see also* Manoharan v. Columbia U. Col. of Phys. & Surg., 842 F.2d 590, 593 (2d Cir. 1988) (Proof of the causal connection can be established indirectly by showing the protected activity was closely followed in time by the adverse action.)

In the case at bar, the Plaintiff was informed in February, one month after the filing of

the lawsuit in January, that the decision not to renew his contract was made the month before, at precisely the same time the Plaintiff filed the instant lawsuit in January. Given that the management had until April to make the decision whether or not to renew his contract, the timing of their decision is a very persuasive indicator that their decision was based on retaliation.

### c.    Houston Has Ample Evidence of Age Discrimination.

The Defendants also discriminated against the plaintiff because of his age. At all times material hereto, the plaintiff was over the age of forty. When the plaintiff commenced his employment with WZMX in April 2000, the radio programming for the station was "Dancin' Oldies." The target audience was persons from ages 25 to 54. In March 2001, WZMX changed its format to "Rhythmic CHR (Contemporary Hit Radio), a format that featured "hip hop" and "rhythm and blues" music.

The term "Rhythmic" is code word in the radio music industry for "black music for white people." As reflected in the plaintiff's bonus structure, WZMX also lowered its target audience from persons 25-54 years old to persons 18-34 years old. Plaintiff was informed, however, that the new target audience also included persons that were in high school, ages 14 to 18 years old.

Plaintiff soon began being denied personal appearances and other substantially younger WZMX employees were given the assignments. Indeed, WZMX hired younger personalities to substitute for the plaintiff. When the plaintiff's personal appearances were expressly requested, WZMX management stated that the plaintiff was "not available," but younger employees were. The plaintiff was, in fact, available and specifically requested public appearances and the statements of WZMX to the contrary were false and misleading.

The plaintiff was told that WZMX wanted a more youthful approach and that WZMX did not believe that the plaintiff could not relate to young people age 18-24. The plaintiff has been denied personal appearances and WZMX has otherwise made a deliberate effort to reduce the outward connection between it and the plaintiff.

Plaintiff was more than qualified to perform his responsibilities with the new format and his age had nothing to do with his ability to attract a listening audience. Nonetheless, the plaintiff's age was a motivating factor in the defendant's mistreatment of the plaintiff in the terms and conditions of his employment. The reasons proffered by the defendants for their treatment of the plaintiff are nothing more than a pretext for unlawful discrimination on account of his age.

### 4.    Houston's Statistical Evidence Is Valid and Relevant.

The statistical evidence was developed during the depositions of Suzanne McDonald and Steven Salhany. In particular, it is necessary to look at three categories of information: (1) information relating to the market share of each of the four Infinity stations broadcasting from the Farmington facility; (2) information relating to the racial demographic breakdown of the listening audiences for each station; and (3) the racial demographic breakdown of the employees of each station.

### (1)    Market Share

The Arbitron market share ratings (see Exhibits 1-5 to McDonald Deposition) for the 18-34 year old age group show that WRCH-fm had during the relevant period a steady market share of about 10-12%; that WTIC-fm started with a market share of about 9% and slipped to about 6% in the same period; that WTIC-am was relatively steady at approximately 2-3 %; and, finally, that WZMX started with a market share of less than 3%  and improved to over

14% by the end of the period shown.  Yet, it should be recalled, Gary Craig, the WTIC-FM

morning show host was paid about 300% of what JD Houston was paid.

    **(2)**    **Market Demographics**

    The Arbitron demographics ratings (see Exhibit 6 to McDonald Deposition) show that

WTIC-FM, WTIC-AM, and WRCH-FM all have an overwhelmingly white audience

throughout the periods shown.  Only WZMX shows a significant audience of black and

hispanic listeners, so much so that the white audience is in the minority for this station.  Stated

another way, WZMX was the only Infinity station to attract minority listeners while at the

same time retaining a white audience base.

    **(3)**    **Employee Demographics**

**See Sealed Portions of Plaintiff's Memorandum of Law In Support of His Objection to**

**Summary Judgment pp. 1-3)**


**V.**    **CONCLUSION:**

    For the reasons stated above, the Court should deny the Defendant's Motion for

Summary Judgment.

                THE PLAINTIFF


                BY_____
                Francis A. Miniter, his attorney
                Miniter & Associates
                100 Wells Street Unit 1D
                Hartford, CT 06103
                860-560-2590 ct09566

**CERTIFICATION**

This is to certify that a copy of the foregoing has been mailed to the following counsel of record this _____ day of July, 2004:

Mark W. Batten
Bingham McCutchen, LLP
150 Federal Street
Boston, MA 02110

Kimberly M. White
Bingham McCutchen
One State Street
Hartford, CT 06103

_____
Francis A. Miniter