UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

_____

WENDELL "JD" HOUSTON          :     CIVIL ACTION NO: 3:03CV0130(AWT)
                                     :
V.                                :
                                     :
INFINITY RADIO LICENSE INC.     :
d/b/a WZMX HOT 93.7, VIACOM, INC.  :
INFINITY BROADCASTING CORP.,   :
INFINITY RADION, INC., INFINITY    :
MEDIA CORPORATION AND CBS      :
RADIO, INC.                    :     JULY 1, 2004

_____

PLAINTIFF'S LOCAL RULE 56 (A)(2) STATEMENT

1.      Admit

2.      Admit

3.      Admit

4.      Admit

5.      Admit

6.      Admit

7.      Admit

8.      Admit

9.      Deny.  See ¶36 of Affidavit of Houston.

10.     Admit

11.     Admit

12.     Admit

13.     Admit

14.     Deny.  See ¶37 of Affidavit of Houston

15.     Admit

16.    Admit

17.    Admit

18.    Admit

19.    Admit

20.    Admit

21.    Admit

22.    Admit

23.    Admit

24.    Admit

25.    Admit

26.    Admit

27.    Admit

28.    Admit

29.    Deny. See ¶38 of Affidavit of Houston.

30.    Admit

31.    Admit

32.    Admit

33.    Admit

34.    Admit

35.    Admit

36.    Admit

37.    Admit

38.    Admit

39.     Admit

40.     Admit

41.     Admit

42.     Admit

43.     Admit

44.     Admit

45.     Admit

46.     Admit

47.     Deny.  At no time did the Plaintiff ever sexually harass a fellow employee or touch her in an improper way.  The employee was delusional when she made those accusations against the Plaintiff.  (See Affidavit of Houston ¶35; Deposition of Houston pp.231-32.)

48.     Admit

49.     Admit

50.     Admit

51.     Admit

52.     Admit

53.     Admit

54.     Admit

55.     Admit

56.     Admit

57.     Admit

58.     Admit

59.     Deny.  See ¶39 of Affidavit of Houston.

60.     Admit

61.     Admit

62.     Admit

63.     Admit

64.     Admit

65.     Admit

66.     Admit

67.     Deny. There is ample evidence to show that the station mistreated its African American employees. Racially derogatory statements made by employees and racially hostile and offensive conduct was tolerated by management and routinely made by employees without consequence. For example, posters using the word "nigger" were hung and then re-hung in areas visible to all African American employees. A figurine depicting a lynching of a black man was left dangling in plain view of all employees. These are not instances that would be directed at the Plaintiff, but would be offensive to all African Americans employed at the station, and as such, constitutes mistreatment. Affidavit of Houston ¶6. In addition, Mr. Houston repeatedly requested that WZMX management undergo diversity training. Each time, this request was met with indifference. (See Affidavit of Houston ¶7, 24)

68.     Admit

69.     Admit

70.     Admit

71.     Admit

72.     Admit

73.     Admit

74.     Admit

75.     Deny. See Affidavit of Houston ¶32.

76.     Deny.

## STATEMENT OF FACTS IN DISPUTE

1.      While Mr. Houston came to WZMX with solid credentials, he was not hired because the station liked him, believed his talents were unique or because it had voluntarily developed progressive attitudes towards employing on-air African American talent.  (Affidavit of Houston ¶ 5)

2.      Before recruiting Mr. Houston, WZMX had an abysmal record of employing African Americans in an on-air capacity while pursuing a format appealing to African Americans. (Affidavit of Houston ¶5)

3.      Under threat of legal action and losing a significant part of its listening audience, WZMX induced Mr. Houston, a highly regarded and experienced African American radio personality in Houston, Texas, to host its "Morning Show." Mr. Houston was hired to appease the critics of WZMX's purposeful exclusion of black on-air talent and to provide window dressing for the station's image.(Affidavit of Houston ¶5)

4.      Like all morning radio personalities, Mr. Houston was employed to use his artistic talent and creative ability to oversee and reshape the structure, content and direction of the "Morning Show." The "Morning Show" is the flagship program of any radio station and its success is of paramount importance.  (Affidavit of Houston ¶6) Yet, from the inception of Mr. Houston's employment, WZMX has continuously frustrated, interfered with and undermined his ability to perform his job; diminished his opportunities for advancement; progressively reduced his community and on-air presence; and fostered and tolerated a hostile work environment. (Affidavit of Houston ¶6)

5.      Posters using the word "nigger" were hung and re-hung in areas visible to the plaintiff and station management. (Affidavit of Houston ¶6)  No individual defendant did anything about it despite the fact that the control room is glassed-in on all sides and the poster was grossly obvious

to all employees.   (Affidavit of Houston ¶6)

6.    In another instance, a figure depicting the lynching of a black man was deliberately left dangling from the plaintiff's radio microphone at WZMX in plain view of all station employees. (Affidavit of Houston ¶6)

7.    Mr. Houston's request to Steve Salhany and Suzanne McDonald that WZMX management undergo diversity training was met with indifference and resentment. (Affidavit of Houston ¶7)

8.    WZMX has continuously misrepresented itself to the public, in particular, African Americans, in order to gain ratings and advertising revenue by disguising its true identity. (Affidavit of Houston ¶8)   The Plaintiff was told by Steve Salhany that his first order of business was to get the station "in good" with the Urban League. (Affidavit of Houston ¶8)

9.    WZMX shamelessly used the Plaintiff's presence by doing all promotions in the black community, but claiming to target suburban white listeners to increase its ratings while simultaneously discrediting the Plaintiff's work and undermining his ability to perform my job by systematically dismantling his show and eliminating his public appearances. (Affidavit of Houston ¶8)

10.    Plaintiff was a highly experienced, well-regarded and successful radio entertainment personality in the Texas area who developed a professional reputation identified with his work. (Affidavit of Houston ¶2)

11.    WZMX was under intense pressure to recruit African Americans to work as on-air personalities because of its historical exclusionary employment practices. Under threat of litigation and to maintain a facade of being interested in the African-American community, WZMX made

efforts over an eight month period to secure the plaintiff's services as the "Morning Show Host" of its then "Dancin' Oldies" program. (Affidavit of Houston ¶10)

12.     As a radio host, the plaintiff is identified with the structure, content and direction of the show and likewise the content of the program is identified with him.  In fact, the Morning Show is the most important day part of any radio station adding to the listening audience, increasing ratings and spurring advertising revenue.   (Affidavit of Houston ¶12)

13.     Morning Show ratings rose significantly while the Plaintiff was employed on the Morning Show at WZMX. (Affidavit of Houston ¶12) The Morning Show rose to #5 in the ratings under his direction.  (Affidavit of Houston ¶37)

14.     The hosts of each of the affiliate Morning Shows are white, as are the entire management staff of WZMX and plaintiff's Morning Show support personnel. The hosts of each morning show have control over the structure, content and direction of their respective morning show programs and are fully supported by station management.  (Affidavit of Houston ¶13)

15.     At all times thereto, the plaintiff performed his job pursuant to his contract and in a manner consistent with workplace procedures, policies, customs and practices.  However, the plaintiff experienced a continuous and unabated pattern of deliberate disparate and hostile treatment by the defendants based upon race, color and gender.  (Affidavit of Houston ¶15)

16.     The plaintiffs authority to oversee and shape the structure, content and direction of the Morning Show programming was undermined from the commencement of his employment for reasons that had nothing to do with any legitimate management prerogative.  (Affidavit of Houston ¶15) The plaintiff's ability to control the conduct of subordinate employees was undermined, particularly as it related to the content of station programming as defined by Federal Law. (Affidavit of Houston ¶15)

17.    Effective April 9, 2001, WZMX hired the plaintiff for a two-year term with an option to renew for an additional one-year at the conclusion of the two-year term.   (Affidavit of Houston ¶16)

18.    The plaintiff's duties under the new contract were not altered, except to add one sentence, which read " (c) Perform other customary duties as may be required to be prepared for on-air and off-air duties."    (Affidavit of Houston ¶16)

19.    The plaintiff executed said contract based upon the representations of WZMX that the contract, with the exception of the term, was identical to the previous contract.  (Affidavit of Houston ¶16)

20.    After signing the contract, however, the plaintiff was told by Steve Salhany, a WZXM management employee: "We got your ass now."  (Affidavit of Houston ¶17)

21.    Plaintiff subsequently discovered that the terms of the contract had been altered and was not identical as negotiated as represented by WZMX.   (Affidavit of Houston ¶17)

22.  Subsequent to the execution of the second contract, the plaintiff's working environment at WZMX became increasingly hostile and unpredictable.   (Affidavit of  Houston ¶18)

23.    Plaintiff's authority to control the structure, content and direction of the morning show programming was further and more severely eviscerated by WZMX management.  (Affidavit of Houston ¶18)

24.    The Plaintiff was treated differently than the Morning Show hosts of Defendant's affiliates.  In particular, the Plaintiff was denied input into the content of the morning show in that specific benchmark features that he implemented were systematically removed from his show without justification or explanation; he was denied personal appearances when his presence was specifically requested by clients; he was micro-managed; he was denied control over subordinate

employees; he was unsupported in the promotion of the Morning Show and not given personal or proper market value enhancement.  (Affidavit of Houston ¶19)

25.    Unlike the Morning Show hosts of other affiliate stations, the plaintiff has been reprimanded for fulfilling his responsibility to shape the content of programming.    WZMX management has supported and encouraged subordinate employees to routinely interfere in the fulfillment of the plaintiff's contractual duties.   (Affidavit of Houston ¶20)

26.    WZMX management has reprimanded without due process the plaintiff for behavior tolerated and openly approved by other employees under the control of WZMX management. For example, the Plaintiff was reprimanded for cursing at Nancy Barrows when she failed to follow his instructions which caused her to give out misinformation over the air, but when Barrows repeatedly cursed at Salhany because he cancelled her vacation, she was not reprimanded. (Affidavit of Houston ¶21a)

27.    WZMX has used the plaintiff's name for personal product endorsements for its own pecuniary benefit and without providing the plaintiff with just compensation. For example,  the Station used the Plaintiff's name and voice for two weeks to sell the Western Union Valentine's Day campaign at a higher than usual advertising rate and then refused to pay him a talent fee. (Affidavit of Houston ¶21b)

28.    WZMX has made illicit deductions from the plaintiff's pay without consent. (Affidavit of Houston ¶21c)

29.    WZMX has failed to compensate the plaintiff in the same manner as other similarly situated affiliate Morning Show hosts and treated the plaintiff unequally in terms of the award, distribution and allocation of employee benefits.  (Affidavit of Houston ¶21d)

30.    WZMX has fostered and tolerated a racially hostile work environment.   Racially derogatory statements made by employees and racially hostile or offensive conduct are tolerated by management and routinely made without consequence.  (Affidavit of Houston ¶21e)

31.    Posters using the word "nigger" were hung and re-hung in areas visible to the plaintiff and a figurine depicting the lynching of a black man was left dangling from the plaintiff's radio microphone in plain view of station employees.  (Affidavit of Houston ¶21e)

32.    The plaintiff was instructed not to quote the first initial of his on-air assistant's last name (i.e. "Nancy B") due to her objection that it was only appropriate to do so if WZMX was an "urban" a/k/a black radio station.  (*See* Deposition of Houston pp. 91-93;  Affidavit of Houston ¶21e)

33.    The Plaintiff was continually treated differently and more harshly than he co-workers. For example, the Plaintiff was chastised by Steve Salhany over a very positive "feature" article about him in the Hartford Courant.  Nancy Barrow, however, was the subject of <u>negative</u> publicity in the Punchline Magazine for being caught onstage in compromising positions with male strippers at the WZMX Ladies Night.  Nothing happened to her, plus management backed her up and threatened to sue the magazine for the negative story about Nancy. (See Affidavit of Houston ¶21f.)

34.    The Plaintiff received a Letter of Reprimand for saying "f*** you" to Barrow when she defied the Plaintiff's instructions not to run the Janet Jackson story on the morning show. However, when Salhany cancelled Barrow's vacation plans due to impending station business, she called Salhany a "motherf*****" to his face several times.  She was not reprimanded. (See Affidavit of Houston ¶21g).

35.    The Plaintiff was told by Steve Salhany in February that his contract was not going to be renewed.  He was told this decision had been made in January, which was the same time as he

filed this lawsuit. (Affidavit of Houston ¶22)

36.    Racially insensitive remarks made by other on-air personalities have been repeatedly made without reprimand and, in fact, encouraged by WZMX management.(Affidavit of Houston ¶23)

37.    Plaintiff has been subjected to retaliation for suggesting that WZMX management undergo management and diversity training.  At all times, upon information and belief, defendants have engaged in a deliberate effort to conceal and otherwise disguise their discriminatory motives from the plaintiff.  (Affidavit of Houston ¶24)

38.    The Defendants also discriminated against the plaintiff because of his age.  At all times material hereto, the plaintiff was over the age of forty. (Affidavit of Houston ¶26)

39.    When the plaintiff commenced his employment with WZMX in April 2000, the radio programming for the station was "Dancin' Oldies." (Affidavit of Houston ¶26)

40.    The target audience was persons from ages 25 to 54.   In March 2001, WZMX changed its format to "Rhythmic CHR (Contemporary Hit Radio), a format that featured "hip hop" and "rhythm and blues" music.  (Affidavit of Houston ¶26)

41.    The term "Rhythmic" is code word in the radio music industry for "black music for white people."  (Affidavit of Houston ¶26) As reflected in the plaintiff's bonus structure, WZMX also lowered its target audience from persons 25-54 years old to persons 18-34 years old.  (Affidavit of Houston ¶27)

42.    Plaintiff was informed by Salhany, however, that the new target audience also included persons that were in high school, ages 14 to 18 years old.  (Affidavit of Houston ¶27) Salhany said to Plaintiff, "Hell, I'm a 38 year old with 2 kids and I can't relate to them." (Affidavit of Houston ¶27)

43.    Plaintiff soon began being denied personal appearances and other substantially younger WZMX employees were given the assignments. (Affidavit of Houston ¶28; Affidavit of Green ¶5; Affidavit of Yvon Alexandre ¶3; Affidavit of Forbes ¶3-6)

44.    Indeed, WZMX hired younger personalities to substitute for the plaintiff.   (Affidavit of Houston ¶28)

45.    When the plaintiff's personal appearances were expressly requested, WZMX management stated that the plaintiff was "not available," but younger employees were. (Affidavit of Houston ¶28; Affidavit of Lumpkin ¶8; Affidavit of Alexandre ¶3; Affidavit of Forbes ¶3-6)

46.    The plaintiff was, in fact, available and specifically requested public appearances and the statements of WZMX to the contrary were false and misleading. (Affidavit of Houston ¶28)

47.    The plaintiff was told by Salhany that WZMX wanted a more youthful approach and that WZMX did not believe that the plaintiff could not relate to young people. (Affidavit of Houston ¶29)

48.    The plaintiff has been denied personal appearances and WZMX has otherwise made a deliberate effort to reduce the outward connection between it and the plaintiff.   (Affidavit of Houston ¶28-9)

49.    The Defendants tolerated from the young, white female co-host of the morning show, Nancy Barrow, insolence, insubordination, obscenity and rudeness to Mr. Houston that would never be tolerated if done by the co-hosts of the morning shows for the other three radio stations in the building ( Allan Camp for WRCH-fm - 100.5, Gary Craig for WTIC-fm - 96.5, Ray Dunaway and Diane Smith for WTIC-am - 1080).  Each of the four stations has a main host, who is paid substantially more than the co-host, and whose duties substantially exceed those of the co-host. **(See Sealed Portions of Plaintiff's 56(A)(2) Statement p. 1.)**

50.    Nancy Barrow objected to traveling to Florida on a business trip with Mr. Houston because she was afraid to do so, Suzanne McDonald, the Stations Manager, sided with her instead of telling her to get over her bigotry.  (See Deposition of Houston at 104-8;421-423).

51.    When Nancy Barrow repeatedly cut off Mr. Houston's mike while he was speaking, and he objected off air, and she threw a temper tantrum, Mr. Houston was blamed.  (See Deposition of Houston at 310-312).

52.    When Barrow called Salhany a "motherf*****' to his face several times, she was not reprimanded. (See Affidavit of Houston ¶21g).

53.    Defendants paid Mr. Houston far less than they paid the other morning show hosts, as the following information, taken from the several contracts, demonstrate:

**(See Sealed Portions of Plaintiff's 56(A)(2) Statement p. 1.)**

54.    Mr. Houston was aware of the diversion of guest appearances and complained about the pattern of activity to no avail.  For Example, from September 2000 to approximately March 2001, the Pyramid Club hired the Plaintiff through Infinity Radio to host events on Saturday nights. The station aired from the Club on Saturday nights in a show called "Club Z." Houston's personality and identity  helped build the business of the Pyramid Club and add to its success.  When the format of the radio station changed to Hip Hop, the station no longer would send JD Houston to events at the Pyramid Club.  After that time, the station would usually send Jenny "Boom Boom" or Kid Fresh to the events sponsored by the Infinity Radio.  The owner of the Pyramid Club, Yvon Alexandre personally requested that JD continue to host "Club Z" but he was told by Kathy Brown that JD Houston was not doing any types of appearances.  After the format change, the station did not send JD to host "Club Z" again.  (See Affidavit of Yvon Alexander ¶¶ 2-3; Affidavit of Forbes¶3.)

55.    Mr. Houston, like the other morning show hosts, often work on weekends, preparing

interviews or performances of local talent for broadcast during the following week. The morning show hosts often received guests at the station for such purpose. The guests of Mr. Houston were frequently black or other minority. Mr. Houston was told after this was discovered by Steve Salhany that he could no longer have guests in the station on the weekend. Mr. Salhany cited the need for safety (implying that black people and other minorities were not to be trusted). No other on-air person was given this directive. It was specific to Mr. Houston. Not coincidentally, the guests of the other hosts tended to be white. (See Affidavit of Houston ¶36)

56.    Mr. Houston obtained an exclusive interview with OJ Simpson, without paying for the interview, despite the fact that at least one other Hartford area station offered Mr. Simpson a fee for an interview. Far from being pleased at Mr. Houston's ability to attract a nationally known person to the station, Mr. Houston was told that from then on, all of his interviews had to be approved in advance. No other on-air host had such restrictions on him. (See Affidavit of Houston ¶25.)

57.    Mr. Houston developed and promoted a segment of the morning show known as the "Daily Power for Living", which was intended to send a message of empowerment, hope and encouragement to the youth of the listening community. (See Affidavit of Lumpkin¶7; Affidavit of Carter ¶6) Defendants took this as their own property and used it nationwide without compensation or recognition to Mr. Houston. (See Affidavit of Houston ¶34.)

58.    Nancy Barrows received a week's training on the Boards when she became host of the Morning Show. When the Plaintiff became the host, he specifically requested training on the Boards from Steve Salhany, but he was told it was not necessary and he was denied training, thus attempting to set him up for failure from the very beginning. (See Affidavit of Houston ¶21h.)

59.    All of the other Morning Show hosts (i.e. Allan Camp, Ray Dunaway and Gary

Craig) are trained to run the control boards and they do so. I was told by Steve Salhany that "You're never going to run the board, JD, in fact, you don't run nothing around here." (Affidavit of Houston ¶21h)

60.     The Arbitron market share ratings for the 18-34 year old age group show that WRCH-fm had during the relevant period a steady market share of about 10-12%; that WTIC-fm started with a market share of about 9% and slipped to about 6% in the same period; that WTIC-am was relatively steady at approximately 2-3 %; and, finally, that WZMX started with a market share of less than 3% and improved to over 14% by the end of the period shown. (see Exhibits 1-5 to McDonald Deposition)

61.     The Arbitron demographics ratings (see Exhibit 6 to McDonald Deposition) show that WTIC-FM, WTIC-AM, and WRCH-FM all have an overwhelmingly white audience throughout the periods shown. (see Exhibits 1-5 to McDonald Deposition)

62.     **(See Sealed Portions of Plaintiff's 56(A)(2) Statement p. 1.)**

63.     That since December, 1999, Yvon Alexandre has been the owner of the Pyramid Club, a nightclub in Hartford, Connecticut. (Affidavit of Alexandre ¶1)

64.      From September 2000 to approximately March 2001, the Pyramid Club hired JD Houston through Infinity Radio to host events on Saturday nights. The station aired from the Club on Saturday nights in a show called "Club Z." Houston's personality and identity helped build the business of the Pyramid Club and add to its success. (Affidavit of Alexandre ¶2)

65.     When the format of the radio station changed to Hip Hop, the station no longer would send JD Houston to events at the Pyramid Club. After that time, the station would usually send Jenny "Boom Boom" or Kid Fresh to the events sponsored by the Infinity Radio. Mr. Alexandre personally requested that JD continue to host "Club Z" but was told by Kathy Brown that JD

Houston was not doing any types of appearances.  After the format change, the station did not send

JD to host "Club Z" again.   (Affidavit of Alexandre ¶3)

66.    That Dr. Rev. Wayne A. Carter is a former Chairman of the Hartford School Board

and a former President the Interdenominational Ministerial Alliance of Hartford.(Affidavit of Carter

¶1)

67.    During the time that JD Houston was employed with WZMX, Dr. Rev. Carter was

a frequent guest of his morning show. (Affidavit of Carter ¶2)

68.    Dr. Carter  was also a music rep/promoter formerly employed by Infinity Radio.

(Affidavit of Carter ¶3)

69.    Dr. Carter is very familiar with WZMX and was very often present at the radio

station during Mr. Houston's employment.  (Affidavit of Carter ¶4)

70.    Dr. Carter witnessed the sight of a poster hanging on the walls of WZMX's radio

booth containing the word "nigger" in plain view for all employees and guests of the studio to

see.(Affidavit of Carter ¶5)

72.     Dr. Carter found JD's program to contain a positive message to the youth in the

community.  JD is articulate and a good role model for the children.  (Affidavit of Carter ¶6)

73.    Management treated JD's guests differently than it treated other radio guests.  For

example, when Dr. Carter  was a guest of JD's show in my role as President of the Hartford School

Board, Victor Star completely failed to acknowledge his presence whenever he was at the station.

He refused to shake Dr. Carter's hand and would not say anything to him until JD forced him to

acknowledge Dr. Carter. (Affidavit of Carter ¶8)

74.    That since 2000, Michael Forbes was the Manager of the Pyramid Club, a nightclub

in Hartford, Connecticut.  (Affidavit of Forbes ¶1)

75.    Starting in Fall, 2000, the Pyramid Club hired JD Houston through Infinity Radio to host many events and Houston's personality and identity helped build the business and add to its success. (Affidavit of Forbes ¶2)

76.    When the format of the radio station changed to Hip Hop, the station no longer would send JD Houston to events at the Pyramid Club, despite the fact that Mr. Frobes continually requested his presence. (Affidavit of Forbes ¶3)

77.    After that time, the station would usually send Jenny "Boom Boom" or Kid Fresh to the events sponsored by the Infinity Radio. The business suffered after the format changed and JD stopped hosting appearances. (Affidavit of Forbes ¶3)

78.    When the station changed to Hip Hop, the advertisement rates shot up. When Mr. Forbes complained, a meeting was held at the station between himself, Kevin Brown (my Account Executive) Kathy Brown and Steve Salhany. Mr. Forbes was told that "if you think rates are high now, once we get rid of JD, you're really going to see a rate change."(Affidavit of Forbes ¶4)

79.    Kevin Brown told me that Mr. Forbes should not use JD Houston to host at the Pyramid Club and that I should use a younger host, such as Jenny "Boom Boom" or Kid Fresh.(Affidavit of Forbes ¶6)

80.    Brown told Forbes that he could no longer use JD Houston. (Affidavit of Forbes ¶7)

81.    Forbes prepared numerous radio advertisements and requested that JD be the personality to voice them. Instead, the station used Jenny "Boom Boom" and Kid Fresh, along with several other radio personalities, none of them JD Houston.(Affidavit of Forbes ¶8)

82.    James Green worked for 93.7, WZMX, from February 2001 to October 2002 as account executive in the sales department. (Affidavit of Green ¶2)

83.    People in the community responded positively to JD. Many business operators

wanted JD for appearances.  This upset the station.  When I got requests for JD to appear from club owners and others, the station did not honor them.  They sent Jenny Munro or others.  This was in violation of the station policy that the customer got the on air personality requested.(Affidavit of Green ¶5)

84.    An example of racism was the taking of customers (for example Rainbow Rentals and Middletown Nissan) from Mr. Green and assigning them to white employees, thereby depriving Mr. Green of commission earnings.  (Affidavit of Green ¶7)

85.    There was a New Year's Eve party that JD was supposed to attend at the Basketball Hall of Fame with station on air presence.  The customer, Sean Weddeburn, an African-American, had specifically asked for JD to appear, and had paid the station $6K for exclusive station coverage for that evening.  The station then eliminated JD from the commercials, adversely affecting turnout for the customer. (Affidavit of Green ¶8)

86.    Mark Fuller, an African-American who organized events called "First Fridays", wanted JD for certain event and to be mentioned in the promoting commercials.  Mr. Green was ordered by Kathy Brown, his supervisor, to remove reference to JD's appearance from the commercials.  (Affidavit of Green ¶9)

97.    There was an occasion when the Promotions Staff was told by its supervisor not to talk to JD directly.   This was extraordinary and contrary to the treatment of other on air personalities.  No other morning show host was included in this restriction.(Affidavit of Green ¶10)

98.    In the summer of 2002, the Jump Start a Life Community Solutions, Inc. wanted JD to help its summer program and contacted me to obtain his presence. However, this was stopped by the Program Director of Victor Star, who said clients could not request specifically for an on-air personality.  They would have to accept whomever they send.  Victor Star said that JD would not

be available.  JD had no conflicting engagements.  (Affidavit of Green ¶11)

99.    The then Promotions Director, Chrissy Johnson, and Kathy Brown, then the Station Manager, prevented JD's involvement when the Comedy Show, in Wallingford, gave money to the station, as well as tickets, to promote an event at which they wanted JD.  They also prevented JD from giving the tickets away on air as is customary.  (Affidavit of Green ¶12)

100.Raymond E. Lumpkin II act as an agent for the booking of talent for various events.(Affidavit of Lumpkin ¶3)

101.    JD was the first black male morning on air personality in the State of Connecticut, and the first at Infinity Radio in Connecticut.  He was not hired until the Urban League applied pressure to Infinity Radio.  (Affidavit of Lumpkin ¶4)

102.    Mr. Lumpkin learned from JD that the position of promotions director was available on two different occasions.  Both times Mr. Lumpkin applied, but was told he was not qualified.  In the end, the person hired, a white woman, had only worked as an intern before taking the job.  (Affidavit of Lumpkin ¶5)

103.    Mr. Lumpkin had studied at Temple University for 3 years in communications and worked for Metromedia from 1980 to 1984 as a news producer and as a promotions assistant.  He later worked for Comcast selling cable television advertising to small businesses. He also worked as research director of Channel 20, WTXX, in Connecticut.  He then established his own business as the Info Depot in 1994.  He was well qualified for the position of Promotions Director and far more qualified than the person hired. (Affidavit of Lumpkin ¶6)

104.    Schools often wanted JD to appear there, in particular, Manchester Hospital School, New Britain Schools,  and Hartford schools, particularly the HALO adult Learning Program.  He did and it made an impact on the young men and women.  He also was in demand at colleges and

halfway houses.  No one from the station ever came to see the work he was doing.  The station

interfered with many of those appearances, claiming that JD was not available, when he in fact was.

(Affidavit of Lumpkin ¶8)

THE PLAINTIFF


BY_____
Francis A. Miniter, his attorney
Miniter & Associates
100 Wells Street Unit 1D
Hartford, CT 06103
860-560-2590 ct09566

## CERTIFICATION

This is to certify that a copy of the foregoing has been mailed to the following counsel of
record this _____ day of July, 2004:

Mark W. Batten
Bingham McCutchen, LLP
150 Federal Street
Boston, MA 02110

Kimberly M. White
Bingham McCutchen
One State Street
Hartford, CT 06103

_____
Francis A. Miniter
