UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WENDELL "JD" HOUSTON | : | CIVIL ACTION NO: 3:03CV0130(AWT) |
| | : | |
| V. | : | |
| | : | |
| INFINITY RADIO LICENSE INC. | : | |
| d/b/a WZMX HOT 93.7, VIACOM, INC. | : | |
| INFINITY BROADCASTING CORP., | : | |
| INFINITY RADION, INC., INFINITY | : | |
| MEDIA CORPORATION AND CBS | : | |
| RADIO, INC. | : | JUNE 21, 2004 |

### AFFIDAVIT OF WENDALL "JD" HOUSTON

STATE OF CONNECTICUT
                Ss: Hartford                June ___, 2004
COUNTY OF HARTFORD

    The undersigned, being over the age of eighteen years, and believing in the obligations of an oath, and being duly deposed, hereby make affidavit and state:

    1.    That I am the Plaintiff in the above entitled action. I am an African-American male and was at all material times over the age of 40 years old.

    2.    At all material times material hereto, I was employed by defendant WZMX as the host of the Morning Show, a radio program with a large listening audience. Prior to April 7, 2000, I was employed as a Morning Radio Host, with a popular radio station in Houston, Texas, a largely populated area. I was a highly experienced, well-regarded and successful radio entertainment personality who developed a professional reputation identified with my work.

    3.    WZMX is a part of Viacom, Inc. whose affiliates include CBS Broadcasting, Inc., VHI, Paramount Pictures, Nickelodeon, TNN, Blockbuster and MTV. In Connecticut, WZMX is affiliated and operated jointly with WTIC/FM 96.5, WRCH/FM 100.5 and WTIC/AM 1080.

4. At the time this lawsuit was filed, I was employed under a two-year contract that was scheduled for renewal on April 9, 2003. In retaliation for the filing of this lawsuit, the Defendants failed and refused to renew my contract.

5. I came to WZMX with solid credentials. However, on information and belief, I was not hired because the station liked me, believed my talents were unique or because the station had voluntarily developed progressive attitudes towards employing on-air African American talent. Before recruiting me, WZMX had an abysmal record of employing African Americans in an on-air capacity while pursuing a format appealing to African Americans. Under threat of legal action and losing a significant part of its listening audience, WZMX induced me, a highly regarded and experienced African American radio personality in Houston, Texas, to host its "Morning Show." I was hired to appease the critics of WZMX's purposeful exclusion of black on-air talent and to provide window dressing for the station's image

6. I was employed to use my artistic talent and creative ability to oversee and reshape the structure, content and direction of the "Morning Show." The "Morning Show" is the flagship program of any radio station and its success is of paramount importance. Yet, from the inception of my employment, WZMX continuously frustrated, interfered with and undermined my ability to perform the job; diminished my opportunities for advancement; progressively reduced my community and on-air presence; and fostered and tolerated a hostile work environment. For example, posters using the word "nigger" were hung and re-hung several times in areas visible to me, other employees, and station management. No individual defendant did anything about it despite the fact that the control room is glassed-in on all sides and the poster was grossly obvious to all employees. In another instance, a figure depicting the lynching of a black man was deliberately left dangling from my radio microphone at WZMX in plain view

of all station employees.

7.  My requests that WZMX management undergo diversity and affirmative action training were met with indifference.  Management, such as Steve Salhany and Suzanne McDonald were very insensitive and resentful to my requests for diversity training.

8.  WZMX has continuously misrepresented itself to the public, in particular, African Americans, in order to gain ratings and advertising revenue by disguising its true identity.  I was told by Steve Salhaney that my first order of business was to get the station "in good" with the Urban League.   WZMX shamelessly used my presence by doing all promotions in the black community, but claiming to target suburban white listeners to increase its ratings while simultaneously discrediting my work and undermining my ability to perform my job by systematically dismantling my show and eliminating my public appearances.

9.  Upon information and belief, defendants Viacom, Infinity Broadcasting, Infinity Radio, Infinity Media and CBS are affiliate companies that, directly or indirectly, establish, control or oversee the employment and personnel polices and procedures of WZMX. (Said defendants are collectively referred to herein as the "defendants").

10.  At the time of my employ, WZMX was under intense pressure to recruit African Americans to work as on-air personalities because of its historical exclusionary employment practices. Under threat of litigation and to maintain a facade of being interested in the African-American community, WZMX made efforts over an eight month period to secure my services as the "Morning Show Host" of its then "Dancin' Oldies" program.

11.  I was initially hired for a one-year term by CBS Radio, Inc., then owner and operator of WZMX/FM by a written contract effective April 7, 2000.  I accepted employment with WZMX with the understanding that I would have artistic control over the structure, content

and direction of the Morning Show, which is customary for all radio stations. Said control was essential to my professional reputation.

12. As a radio host, I was identified with the structure, content and direction of the show and likewise the content of the program is identified with me. In fact, the Morning Show is the most important day part of any radio station, adding to the listening audience, increasing ratings and spurring advertising revenue. Morning Show ratings rose significantly while I was employed on the Morning Show at WZMX. After six months on the station, I received a bonus based on an increase in our ratings. I received a second ratings bonus shortly before we changed formats to hip hop.

13. WZMX is an affiliate of several Connecticut radio stations, WRCH/FM 100.5, WTIC/FM, 96.5 and WTIC/AM 1080, each with its own programming and morning shows. The hosts of each of the affiliate Morning Shows are white, as are the entire management staff of WZMX and plaintiff's Morning Show support personnel. The hosts of each morning show at the other stations have control over the structure, content and direction of their respective morning show programs and are fully supported by station management.

14. I was hired to render and furnish artistic and professional services as an "On-Air Host Personality" in which I had contracted to perform the following duties:

DUTIES:

Both when broadcasting and when otherwise representing Employer or Station, Employee shall perform to the best of his ability the following duties:

(a) Prepare, present, and deliver live and recorded talk shows and other programming requirements, including the voicing of commercials ("Programs");

(b) Perform all duties required of announcers at Station in technical operations and/or by Federal Communications Commission ("FCC") regulations ... Furthermore, Employee agrees to conform to and abide by the requirements of all laws, rules and regulations applicable to his services, including but not limited to,

all rules and regulations of the Federal Communications Commission or any other governmental agency.

(c) Make public appearances, which may be broadcast on Station, that promote and publicize Station or Employer or aid in the selling of commercial time on Station;

(d)     Attend meetings with Station's officers involving the production, direction, and the creation of ideas for Programs, entertainment, advertising and other related fields at reasonable times and without additional compensation in furtherance of the commercial value of the Programs;

(f)     Perform any ancillary duties, consistent with Employee's position, that Employer may, in its sole and subjective discretion, require from time to time, including but not limited to the occasional dubbing of commercials, in emergency situations, under the direction of Station's Program Director.

Employee's services shall be rendered at the facilities of Station or from such other remote locations as Employer or Station may select.

15.     I performed my job pursuant to my contract and in a manner consistent with workplace procedures, policies, customs and practices.  However, I experienced a continuous and unabated pattern of deliberate disparate and hostile treatment by the defendants based upon my race, color and gender.  My authority to oversee and shape the structure, content and direction of the Morning Show programming was undermined from the commencement of my employment for reasons that had nothing to do with any legitimate management prerogative.  My ability to control the conduct of subordinate employees was undermined, particularly as it related to the content of station programming, as defined by Federal Law.

16.     Effective April 9, 2001, WZMX hired me for a two-year term with an option to renew for an additional one-year at the conclusion of the two-year term.  My duties under the new contract were not altered, except to add one sentence, which read " (c) Perform other customary duties as may be required to be prepared for on-air and off-air duties."  I executed said contract based upon the representations of WZMX that the contract, with the exception of

the term, was identical to the previous contract.

17.     After signing the contract, however, I was told by Steve Salhany, a WZXM management employee: "We got your ass now." I subsequently discovered that the contract had been altered and was not the same as we had negotiated for, as represented by WZMX.

18.     Subsequent to the execution of the second contract, my working environment at WZMX became increasingly hostile and unpredictable. My authority to control the structure, content and direction of the morning show programming was further and more severely eviscerated by WZMX management.

19.     I was treated differently than the Morning Show hosts of Defendant's affiliates. In particular, I was denied input into the content of the morning show in that specific benchmark features that I implemented were systematically removed from my show without justification or explanation; I was denied personal appearances when my presence was specifically requested by clients; I was micro-managed; I was denied control over subordinate employees; I was unsupported in the promotion of the Morning Show and not given personal or proper market value enhancement.

20.     Unlike the Morning Show hosts of other affiliate stations, I was reprimanded for fulfilling my responsibility to shape the content of programming.  WZMX management has supported and encouraged subordinate employees to routinely interfere in the fulfillment of the my contractual duties.

21.     WZMX management has treated me differently from other station employees in the following ways:

a.     The station has reprimanded me without due process for behavior tolerated and openly approved by other employees under the control of WZMX management. For example, I

was reprimanded for cursing at Nancy Barrows when she failed to follow my instructions and she gave out misinformation over the air, but when Barrows <u>repeatedly</u> cursed at Salhany because he cancelled her vacation, she was not reprimanded.

      b.      WZMX has used my name for personal product endorsements for its own pecuniary benefit and without providing me with just compensation, for example when the Station used my name and voice for two weeks to sell the Western Union Valentine's Day campaign at a higher than usual advertising rate and then refused to pay me a talent fee.

      c.      WZMX has made illicit deductions from my pay without my consent.

      d.      WZMX failed to compensate me in the same manner as other similarly situated affiliate Morning Show hosts and treated me unequally in terms of the award, distribution and allocation of employee benefits.

      e.      WZMX has fostered and tolerated a racially hostile work environment. Racially derogatory statements made by employees and racially hostile or offensive conduct were tolerated by management and routinely made without consequence. For example, posters using the word "nigger" were hung and re-hung in areas visible to me and other station employees and a figurine depicting the lynching of a black man was left dangling from my radio microphone in plain view of station employees. I was also instructed by Steve Salhany not to quote the first initial of my on-air assistant's last name (i.e. "Nancy B") due to her objection that it was "too black" and not good for her career.

      f.      I was chastised by Steve Salhany over a very positive "feature" article about me Sunday Hartford Courant. Nancy Barrow, however, was the subject of <u>negative</u> publicity in the Punchline Magazine for being caught onstage in compromising positions with male strippers at the WZMX Ladies Night. Nothing happened to her, plus management backed her up and

threatened to sue them for the negative story about Nancy.

    g.    I received a Letter of Reprimand for saying "f*** you" to Barrow when she defied my instructions not to run the Janet Jackson story on the morning show. However, when Salhany cancelled Barrow's vacation plans due to impending station business, she called Salhany a "motherf*****" to his face several times. She was not reprimanded.

    h.    Nancy Barrows received a full week's, hands-on training on the Control Boards when she took over for Sebastian on the Morning Show. When I became the host, I specifically requested training on the Boards from Steve Salhany, but I was told it was not necessary and I was denied training. I feel that because I was denied training, Salhany was trying to set me up to fail. All of the other Morning Show hosts (i.e. Allan Camp, Ray Dunaway and Gary Craig) are trained to run the control boards and they do so. I was told by Steve Salhany that "You're never going to run the board, JD, in fact, you don't run nothing around here."

22.    I was told by Steve Salhany in February that my contract was not going to be renewed. I was told this decision had been made in January, which was the same time as I filed this lawsuit.

23.    Racially insensitive remarks made by other on-air personalities have been repeatedly made without reprimand and, in fact, encouraged by WZMX management.

24.    I have been subjected to retaliation for suggesting that WZMX management undergo management and diversity training. At all times, upon information and belief, the defendants have engaged in a deliberate effort to conceal and otherwise disguise their discriminatory motives.

25.    I was the only DJ that had to have all of his interviews pre-authorized by management. This came about after I interviewed OJ Simpson on the air. Had any other DJ had

the opportunity to interview OJ Simpson, they would have been rewarded.  However, I was reprimanded.

26.     The Defendants also discriminated against me because of my age.  At all times material hereto, I was over the age of forty.  When I commenced my employment with WZMX in April 2000, the radio programming for the station was "Dancin' Oldies."  The target audience was persons from ages 25 to 54.   In March 2001, WZMX changed its format to "Rhythmic CHR (Contemporary Hit Radio), a format that featured "hip hop" and "rhythm and blues" music.  The term "Rhythmic" is code word in the radio music industry for "black music for white people."

27.     As reflected in the my bonus structure, WZMX also lowered its target audience from persons 25-54 years old to persons 18-34 years old.  I was informed by Salhany, however, that the new target audience also included persons that were in high school, ages 14 to 18 years old and that I could not relate to them.  Salhany said, "Hell, I'm a 38 year old with 2 kids and I can't relate to them."

28.     I  soon began being denied personal appearances and other substantially younger WZMX employees were given the assignments.   Indeed, WZMX hired younger personalities to substitute for me.   When my personal appearance was expressly requested, WZMX management stated that I was "not available," but younger employees were.  I was, in fact, available and specifically requested public appearances and the statements of WZMX to the contrary were false and misleading.

29.     I was told by Salhany that WZMX wanted a more youthful approach and that WZMX did not believe that I could relate to young people age 14-24.  I was denied personal appearances and WZMX has otherwise made a deliberate effort to reduce the outward connection between myself and the public.

30. I was more than qualified to perform my responsibilities with the new format and my age had nothing to do with my ability to attract a listening audience. Nonetheless, my age was a motivating factor in the defendant's mistreatment of me in the terms and conditions of my employment. The reasons proffered by the defendants for their treatment of the me are nothing more than a pretext for unlawful discrimination on account of my age.

31. WZMX had the white women announcers (Jenny Munro and Nancy Barrow) fake black accents to give a false impression to the listening audience that they employed African Americans, while maintaining an essential sense of whiteness and superiority.

32. Upon information and belief, the wages of the morning personalities at Infinity Radio were paid substantially more than I was. The hosts were as follows: WTIC-FM Gary Craig; WTIC-AM Ray Dunaway and Diane Smith; WRCH-FM Allan Camp WZMX JD Houston.

33. I developed and promoted a segment of the morning show known as the "Daily Power for Living," which was intended to send a message of empowerment, hope and encouragement to the youth of the listening community. Defendants took this as their own property and used it in national advertising campaigns without giving me compensation or recognition.

34. At no time did I ever sexually harass a fellow employee or touch her in an improper way. I believe the employee was delusional when she made those accusations against me.

35. Like the other morning show hosts, I often worked on weekends, preparing interviews or performances of local talent for broadcast during the following week. The morning show hosts often received guests at the station for such purpose. My radio guests were

frequently black or other minority. I was told after this was discovered by Steve Salhany that I could no longer have guests in the station on the weekend. Mr. Salhany cited the need for safety (implying that black people and other minorities were not to be trusted). No other on-air person was given this directive. It was specific directed at me. Not coincidentally, the guests of the other hosts tended to be white.

36. I did not come into conflict with Nancy Barrow over her "insubordination." I overheard a phone call she was having in which she indicated that she refused to take direction from me. I immediately went to Salhany in confidence and told him that there might be a problem. He told me to "get used to her."

37. The Morning Show rose to #5 in the ratings under my direction. If you carefully read the Defendant's ¶14 of the 56A Statement, they say WZMX placed approximately tenth to fifteenth in the Hartford Market "for listeners 12 and over, **including all parts of the day**." My Morning Show, however, was far more successful than the rest of the day.

38. I take issue with the words "demanded of her" in ¶29 of the 56A Statement. I spoke to Barrow very calmly until she started yelling at me.

39. The CHRO never properly investigated my claims. I was never interviewed in the process and no hearings were held. I was not given a chance to articulate my claims.

Dated at Hartford, Connecticut this \_\_\_\_ day of June, 2004.

_____
Wendall "JD" Houston

Subscribed and sworn to before me this \_\_\_ day of June, 2004.

_____
Christine E. Corriveau
Commissioner of the Superior Court